Geri ACUFF, et al., Plaintiffs,

v.

IBP, INC., Defendant.

No. 97–4127.

United States District Court,
C.D. Illinois.

Dec. 22, 1999.

Robert K. Leyshon, Winstein, Kavensky & Wallace, Rock Island, IL, for Plaintiffs.

Arthur W. Eggers, James S. Zmuda, Califf & Harper, PC, Moline, IL, for Defendant.

### ORDER

MIHM, District Judge.

This matter is before the Court on Defendant, IBP, Inc.'s ("IBP"), Motion for Summary Judgment. For the reasons stated herein, the Motion is GRANTED IN PART and DENIED IN PART. The parties' Motions for Oral Argument are DENIED.

### I. Factual Background

Plaintiffs in this case claim that IBP intruded upon their seclusion when it allegedly surreptitiously videotaped Plaintiffs receiving medical treatment in the nurse manager's office ("NMO") at IBP's Joslin, Illinois, facility. Plaintiffs further claim that IBP violated several statutory provisions in the Illinois Compiled Statutes when it conducted its video surveillance of the NMO and request that this Court recognize implied rights of action under each of the statutes.

On or about October 15, 1997, Rick Nimrick ("Nimrick"), IBP's complex personnel manager at the Joslin facility, informed Glen Bote ("Bote"), an area security manager for IBP, that there was a problem with items disappearing from the NMO. Bote subsequently had security employees place a camera in the ceiling tiles of the NMO, and the camera began operating on October 15th. The camera was attached to a VCR, which when running would record whatever was captured on the camera. There is no evidence that the camera had audio capabilities. Additionally, there is no evidence that the camera was hooked up to a monitor for purposes of contemporaneous viewing.

The NMO constitutes a single room in the Health Services Department. Other rooms in the Health Services Department include an examination room, a common area, and a bathroom. IBP nurses work in the Health Services Department and provide healthcare at the workplace for employees. While the camera was in operation in the NMO, the nurses allegedly treated some patients in that room. According to IBP, when it installed the camera in the NMO, Nimrick, Bote, and the employees that installed the camera were unaware that employee examinations were taking place in the NMO.

On or about October 24, 1997, the camera captured an IBP employee going through a desk drawer in the NMO. The following day, the employee was shown the videotape of himself going through a desk drawer and was immediately terminated from his employment. After the employee was terminated, word spread quickly around the Joslin facility that IBP was conducting video surveillance in the NMO. According to IBP, the camera was out of operation as of October 25, 1997; however, it was not removed from above the ceiling tiles until October 29, 1997. According to Plaintiffs, there is sufficient evidence for a reasonable trier of fact to conclude that the camera continued running through October 29, 1997.

IBP has now moved for summary judgment on Plaintiffs' common law claims of intrusion upon seclusion and on claims that IBP violated various statutory provisions of the Illinois Compiled Statutes. Two Plaintiffs, Thomas Hoffman and Joseph Lannen, have previously been dismissed with prejudice from this action.

This Order follows.

### II. Summary Judgment Standard

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a

triable issue. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 323, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue of fact for trial. *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. This Court must then determine whether there is a need for trial—whether, in other words, there are any genuine material factual issues that can properly be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. *See Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

## III. Discussion

### A. Plaintiffs Who Facially Have Failed to Create a Disputed Issue of Material Fact

Before the Court begins its analysis of IBP's Motion for Summary Judgment and Plaintiffs' Response thereto, there is some housekeeping that must take place. Plaintiffs' counsel concedes in the Response that the following Plaintiffs cannot create a disputed issue of material fact regarding whether they were examined or treated in the NMO during the relevant time frame: (1) Aaron Youngberg; (2) Randy Vinson; (3) Servio Mercado; (4) Patsy Boyer; (5) Condillard Howard; and (6) Shari Myles. Accordingly, these six Plaintiffs are DIS-MISSED WITH PREJUDICE from this action.

Plaintiffs' counsel also concedes that Eric Taylor, Guy Thompson, and Debra Baker should be dismissed from the lawsuit because they cannot create a disputed issue of material fact. However, the Court is unable to dismiss these individuals from the lawsuit since they were never named as Plaintiffs in the Second Amended Complaint.

Lastly, the Court addresses Plaintiffs' counsel's contention that Julie Stearns ("Stearns") has created a disputed issue of material fact. This contention is problematic since Stearns was never named as a Plaintiff in the Second Amended Complaint. Therefore, whether Stearns could create a disputed issue of material fact is irrelevant.

Therefore, the only Plaintiffs who were named in the Second Amended Complaint and claim that there are disputed issues of material fact are: (1) Geri Acuff; (2) Fred McGee; (3) Cheryl Cowan; (4) Sharee Murphy; (5) Bobby Jo Barker; (6) Chris Liras; (7) Theresa Carbo; (8) Thomas Walls; (9) Myrna Rodriguez; (10) Blaz Rosales; (11) Florene Branham; (12) Myrna Ruiz; and (13) Candice Christianson.

### B. Intrusion Upon Seclusion Claims

The Illinois Appellate Court is split among the First, Third, Fourth, and Fifth Districts on the issue of whether Illinois recognizes the tort of intrusion upon seclusion. *See, e.g., Davis v. Temple,* 284 Ill. App.3d 983, 220 Ill.Dec. 593, 673 N.E.2d 737, 744 (5th Dist.1996) (recognizing the cause of action, but affirming dismissal of claim on substantive grounds); *Melvin v. Burling,* 141 Ill.App.3d 786, 95 Ill.Dec. 919, 490 N.E.2d 1011, 1013 (3rd Dist.1986) (recognizing the cause of action); *Kelly v. Franco,* 72 Ill.App.3d 642, 28 Ill.Dec. 855, 391 N.E.2d 54, 57 (1st Dist.1979) (refusing to recognize the cause of action); *Bureau of Credit Control v. Scott,* 36 Ill.App.3d 1006, 345 N.E.2d 37, 40 (4th Dist.1976) (refusing to recognize the cause of action).

It appears that the Second District has yet to address this issue. Furthermore, the Illinois Supreme Court has yet to be faced with a factual scenario requiring it to resolve the conflict among the district courts. *See Lovgren v. Citizens First Nat'l Bank of Princeton,* 126 Ill.2d 411, 128 Ill.Dec. 542, 534 N.E.2d 987, 989 (1989). Similarly, the Seventh Circuit has yet to be presented with a factual scenario requiring it to determine the law it believes the State's highest court would adopt were it to decide the issue. *See Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1183–84 (7th Cir.1993).

■ IBP contends that this Court should not recognize the tort of intrusion upon seclusion, arguing that the Illinois Supreme Court would not recognize the tort if it were forced to resolve the conflict among the appellate districts. *See Allen v. Transamerica Ins. Co.,* 128 F.3d 462, 466–67 (7th Cir.1997) (a federal court is to imagine itself as the state supreme court rather than an intermediate court of the state); *Wood v. Allstate Ins. Co.,* 21 F.3d 741, 743–44 (7th Cir.1994) (same). IBP asserts that "the Illinois Supreme Court in *Lovgren* and the Seventh Circuit in *Brazinski* both have had opportunities to recognize the cause of action ... but failed to recognize such a valid cause of action in Illinois when confronted with the issue...." (Dft.Mem. at 15). However, IBP has overstated the precedential value of *Lovgren* and *Brazinski*. In *Lovgren,* the supreme court stated, "We do not find it necessary ... to resolve these differences [among the appellate districts]" because the alleged facts "[did] not satisfy the elements of [the] tort of unreasonable intrusion...." *Lovgren,* 128 Ill.Dec. 542, 534 N.E.2d at 989. Similarly, in the Seventh Circuit case of *Brazinski,* the court of appeals was not faced with a factual scenario that required it to decide whether the Illinois Supreme Court would recognize such a tort. *See Brazinski,* 6 F.3d at 1183–84. Therefore, contrary to IBP's argument, neither the Seventh Circuit nor the Illinois Supreme Court have rejected the tort of intrusion upon seclusion.

On the opposite end of the spectrum is Plaintiffs' argument why this Court should recognize the tort of intrusion upon seclusion. They proffer the following rhetorical question: "Had the [*Lovgren* court] not intended to adopt such a tort in the future, why would it take time to spell out the elements for such a tort and give examples?" Perhaps the answer to this question is that the Illinois Supreme Court could not determine whether the factual scenario presented on appeal supported the elements of the tort of intrusion upon seclusion unless it first explained what the tort is and what elements must be established. Furthermore, to ask this Court to read between the lines of the *Lovgren* decision for some signal that the supreme court plans to adopt the cause of action in the future is contrary to the court's admonishment: "We *emphasize* that our discussion of the tort of unreasonable intrusion into the seclusion of another, as enunciated by the Restatement and by Prosser, *does not imply a recognition* by this court of such a cause of action." *Lovgren,* 128 Ill.Dec. 542, 534 N.E.2d at 989 (emphasis added).

The parties' arguments on the issue of whether this Court should recognize the common law tort of intrusion upon seclusion are long on counting the number of Illinois state and federal district courts that have sided with their respective positions and long on creating subtle implications from court opinions where there are none to be found. However, the parties' briefs are quite short and perfunctory on policy, which is at the heart of the issue of whether this Court believes that the Illinois Supreme Court will recognize the tort of intrusion upon seclusion when presented with the proper occasion to consider the matter.

Although both sides' arguments on this issue are lacking, the Court must determine whether the Illinois Supreme Court would recognize such a cause of action since, as revealed later in this Order, there are disputed issues of material fact in this

case that would require the case to go forward if there were such a cause of action. The Court believes that the Illinois Supreme Court would recognize the tort, and, therefore, this Court recognizes it in this case. The Court's conclusion rests, in part, on the Illinois Constitution, which provides:

> Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law freely, completely, and promptly.

Ill. Const., art. I, § 12. Illinois case authority is clear that this constitutional provision, despite its mandatory language, is an expression of philosophy that does not mandate the creation of a cause of action or remedy in each case where one does not exist. *See, e.g., Bart v. Board of Education of City of Chicago,* 256 Ill.App.3d 880, 197 Ill.Dec. 970, 632 N.E.2d 39, 43 (1st Dist.1993) (collecting cases). Nevertheless, even though not a mandatory provision, it is a legislative expression of the philosophy that privacy, *inter alia,* is important in the State of Illinois. The Illinois legislature is even more specific with regard to the need for privacy in the provision of health care, as exemplified by the Illinois Nursing Act, 225 ILCS 65/10–5, *et seq.,* and the Medical Patient Rights Act ("MPRA"), 410 ILCS 50/0.01, *et seq.* Accordingly, although the Illinois Supreme Court *might* not adopt the tort of intrusion upon seclusion to remedy every type of offensive intrusion in the workplace, this Court finds that the supreme court would, at a minimum, adopt this tort as a potential remedy for an employee who was surreptitiously videotaped by his employer while receiving medical treatment in the workplace.

#### 1. Intent

■ IBP argues that even if this Court were to recognize the intrusion upon seclusion tort, the requisite intent is not present in this case for IBP to be held liable. In its Memorandum in Support of its Motion for Summary Judgment, IBP contends that none of the IBP employees involved in the installation of the camera intended to make an unauthorized intrusion; hence, the requisite intent is not present. In its Reply Brief, IBP steps its intent argument up a notch, arguing that for it to be held liable for the alleged intentional tort of one of its employees, the alleged tortfeasor must be the alter ego of the corporation or the corporation must have a policy to commit the intentional tort. IBP, in fact, goes so far to say that the Seventh Circuit has made this point of law very clear, citing to the case of *Tacket v. General Motors Corp.,* 93 F.3d 332, 334–35 (7th Cir.1996).

This argument is flawed for two reasons. First, the court in *Tacket* was addressing Indiana, not Illinois, law. The Court need not remind IBP that this is a diversity case where all of the material events alleged by Plaintiffs occurred in the State of Illinois. A cursory review of *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and its progeny reveals that it is Illinois law to which this Court must adhere, not the Seventh Circuit's interpretation of Indiana law. Second, even assuming the *Tacket* court were interpreting Illinois law, the issue in that case was whether the state worker's compensation remedies were the exclusive remedies for an employee injured by the intentional tort of a supervisor. As discussed immediately below, this issue was not properly raised by IBP in these summary judgment proceedings.

■ It appears that IBP did not truly catch on to the worker's compensation exclusivity argument until it sought leave to file a Response to Plaintiff's Sur–Reply. In its Response to Plaintiffs' Sur–Reply, IBP cites Illinois case authority that establishes that a co-employee's intentional tort in the workplace may be attributable to the employer in only one of two ways: (1) the employer specifically commanded or authorized the co-employee to commit the intentional tort; or (2) the co-employee acted as the alter ego of the employer. *See, e.g., Meerbrey v. Marshall Field &*

*Co., Inc.,* 139 Ill.2d 455, 151 Ill.Dec. 560, 564 N.E.2d 1222, 1226 (1990). If the intentional tort does not meet one of these two situations, then the employee's sole remedy for his or her injury is under the Illinois Worker's Compensation Act.

■ If one assumes that a citation to a Seventh Circuit case interpreting Indiana worker's compensation law sufficiently raises the issue of worker's compensation exclusivity in Illinois, then *at best* IBP did not raise this argument until it filed its Reply, which is too late in the summary judgment process to raise this argument. *Cf. United States v. Spaeni,* 60 F.3d 313, 317 (7th Cir.1995) (arguments raised on appeal for the first time in a reply brief are waived). Of course, if the exclusivity rule of the Illinois Worker's Compensation Act is jurisdictional, then the Court would be bound to address the issue in spite of the fact that it was untimely raised by IBP. However, based on the Court's research, the exclusivity rule in Illinois is not jurisdictional. Instead, it is an affirmative defense that must be pleaded and proven by the employer. *See Geise v. Phoenix Co. of Chicago,* 159 Ill.2d 507, 203 Ill.Dec. 454, 639 N.E.2d 1273, 1275 (1994); *Doyle v. Rhodes,* 101 Ill.2d 1, 77 Ill.Dec. 759, 461 N.E.2d 382, 386–87 (1984); *Sobczak v. Flaska,* 302 Ill.App.3d 916, 236 Ill.Dec. 116, 706 N.E.2d 990, 994 (1st Dist.1998).

■ Because IBP has waived its worker's compensation exclusivity rule argument, at least for purposes of its Motion for Summary Judgment, the Court will proceed under the general rule of corporate liability advanced by Plaintiffs and set forth in Illinois case law. Under Illinois law, "if an employee commits an intentional tort with the ... purpose of furthering the employer's interest ... *respondeat superior* may lie...." *Randi F. v. High Ridge YMCA,* 170 Ill.App.3d 962, 120 Ill. Dec. 784, 524 N.E.2d 966, 970 (1st Dist. 1988); *see also Bremen State Bank v. Hartford Accident & Indemnity Co.,* 427 F.2d 425, 428 (7th Cir.1970) ("Our reading of the cases leads us to conclude that the rule in Illinois is that the employer is liable for the negligent, willful, malicious, or criminal acts of its employees when such acts are committed during the course of employment and in furtherance of the business of the employer...."). The Seventh Circuit has stated:

> Under Illinois law, the conduct of a servant is within the scope of employment if, but only if: (1) it is of the kind he is employed to perform; (2) it occurs substantially within the authorized time and space limits; and (3) it is actuated, at least in part, by a purpose to serve the master.

*Duffy v. United States,* 966 F.2d 307, 314 (7th Cir.1992). There is sufficient evidence in the record from which a reasonable trier of fact could find that all three elements can be established by Plaintiffs, and IBP does not argue otherwise.

■ IBP, however, argues that intent is not present in this case even if Plaintiffs were to proceed under the theory of *respondeat superior.* As the basis for its argument, IBP relies on the "three most basic elements" of "intent" set forth in *Prosser & Keeton on Torts:*

> (1) it is a state of mind; (2) about the consequences of an act (or omission) and not about the act itself; and (3) it extends not only to having in the mind a purpose (or desire) to bring about a given consequence but also to having in mind a belief (or knowledge) that given consequences are substantially certain to result from the act. It is also essential that the state of mind of intent exists when the act occurs.

W. Page Keeton, *et al., Prosser & Keeton on Torts,* § 8, p. 34 (emphasis and footnotes omitted) (*"Prosser & Keeton on Torts"*). According to IBP, because it installed the camera in the NMO to catch a thief, it did not "intend" to intrude on anyone's seclusion. It further argues that Nimrick, Bote, and the employees who installed the camera had no notice that examinations and treatments were taking place in the NMO when the camera was installed.

Plaintiffs make two arguments in response. Plaintiffs initially argue that the nurses who worked in the Health Services Department knew that examinations and treatments were conducted in the NMO; therefore, their knowledge must be imputed to IBP even though the nurses did not know about the videotaping. Plaintiffs also argue that the agents of IBP who viewed the tapes continued to videotape the NMO despite seeing employees soaking their hands in the NMO. Accordingly, Plaintiffs contend that even accepting IBP's assertion that Nimrick, Bote, and the employees who installed the camera did not know that the NMO was used for treatment, the requisite intent is still present because: (1) the nurses' knowledge is imputed to IBP; or (2) IBP continued to videotape even after those who viewed the tapes realized that medical treatment was being provided to employees in the NMO.

■■■ IBP offers no argument why the nurses' knowledge, particularly Cathy McCarter's ("McCarter"), should not be imputed to IBP. McCarter was at the relevant times herein the nurse manager at IBP. She testified that she knew that examinations were being conducted in the NMO. (McCarter Dep. at 6–18). Under Illinois law:

> Corporations are artificial legal entities, and the only knowledge which a corporation can be said to have is the knowledge which is imputed to it under principles of agency law.... Thus, knowledge which a corporate agent receives while acting within the scope of his or her agency is imputed to the corporation if the knowledge concerns a matter within the scope of the agent's authority....

*Campen v. Executive House Hotel, Inc.*, 105 Ill.App.3d 576, 61 Ill.Dec. 358, 434 N.E.2d 511, 517 (1st Dist.1982). Based on the three scope of employment factors set forth above, *see Duffy, supra*, the Court concludes that there is sufficient evidence in the record from which a reasonable trier of fact could conclude that McCarter was acting within the scope of her employment as nurse manager when she conducted or observed other nurses conducting examinations in the NMO. Because there is evidence that McCarter was acting within the scope of her authority when she knew examinations were taking place in the NMO, there is evidence that IBP, the corporate principal, had knowledge of this fact when the decision was made to conduct surveillance. Hence, a reasonable trier of fact could conclude, at a minimum, that IBP acted in the face of a known risk.

The Court also finds that Plaintiffs' second argument why the evidence coud support a conclusion by the finder of fact that IBP had the requisite intent is meritorious. Norma Koopman ("Koopman"), the senior security officer at the Joslin, Illinois, facility, testified that when she viewed the videotapes, she saw some employees soaking their hands in the NMO. (Koopman Dep. at 8–9). Whether this is all that she saw on the videotapes or not, the Court believes that a reasonable trier of fact could conclude that Koopman, acting on behalf of IBP, was sufficiently placed on notice that something more than nurse managing was occurring in the NMO. Furthermore, during the class certification hearing, Acuff, a nurse at IBP and a Plaintiff in this lawsuit, testified that she was examined for a groin injury in the NMO on October 15, 1997, at approximately 5:30 p.m. For her examination, she had to pull her pants down to her knees. (Class Cert. Hrg.Tr. at 16). Given that the evidence in the record shows that the camera was installed and running by October 15, if the Court credits Acuff's testimony (which it must do at the summary judgment stage), there is a reasonable inference that she was captured on tape while being examined. Of course, the Court recognizes that both Koopman and Bote have asserted that they did not see anyone receiving treatment (other than soaking hands) and/or in a state of undress in the NMO, but that factual and credibility issue will be for the trier of fact to decide, not the Court at summary judgment.

924

Based on the testimony that medical examinations took place in the NMO during the relevant time and Koopman's and Bote's testimony that the tapes were viewed each day, a reasonable juror could conclude that IBP was on notice that examinations and/or medical treatments were taking place in the NMO when Koopman and Bote began viewing the tapes. Additionally, the camera continued to run until October 25 (IBP's version) or through October 29 (Plaintiffs' version).

Consequently, whether it is McCarter's knowledge or Bote's and Koopman's alleged knowledge that medical treatment was administered in the NMO that is imputed to IBP, a reasonable trier of fact could conclude that IBP had in mind a belief or knowledge that consequences other than catching an alleged thief were substantially certain to result from the videotaping. *See Prosser & Keeton on Torts,* § 8, at 34.

### 2. Analysis of Remaining Elements

■ The Illinois courts that have recognized the intentional tort of intrusion upon seclusion have used the following prima facie case:

> (1) an unauthorized intrusion or prying into the plaintiff's seclusion; (2) the intrusion must be offensive or objectionable to a reasonable man; (3) the matter upon which the intrusion occurs must be private; and (4) the intrusion causes anguish and suffering.

*Melvin,* 95 Ill.Dec. 919, 490 N.E.2d at 1013–14 (citations omitted); *see also Lovgren,* 128 Ill.Dec. 542, 534 N.E.2d at 987 (intrusion must be "highly offensive") (dictum); Restatement (Second) of Torts § 652B, at 378 (1977). IBP alleges in its Motion and Supporting Memorandum that Plaintiffs are unable to establish any of the four elements. The Court quickly disposes of any argument by IBP that the matter allegedly intruded upon was not a private matter (the third element). There are few things in life that are more private than medical treatments and/or examinations. Additionally, the Court will not address the first part of the first element—the

intrusion was unauthorized—since IBP does not argue in its Motion or Supporting Memorandum that any of the remaining Plaintiffs actually authorized IBP to tape them (assuming Plaintiffs were taped). The Court will also not address the fourth element of the prima facie case—the intrusion caused anguish and suffering—with regard to each Plaintiff unless specifically raised by IBP regarding a specific Plaintiff. This is because discovery on the issue of damages for many of the Plaintiffs was put on hold pending the Court's resolution of the Motion for Summary Judgment. Since the fourth element of the prima facie case is intertwined with the issue of damages, any argument by IBP that a Plaintiff who has yet to be deposed on the issue of damages has not endured anguish and suffering cannot be made in good faith. This, however, is not a blanket ruling. As discussed later in this Order, at least one Plaintiff has admitted during his deposition that he did not suffer any distress over allegedly being videotaped, and IBP has argued that this Plaintiff cannot establish the fourth element of the prima facie case.

A fair reading of IBP's Motion and Supporting Memorandum reveals that it is essentially attacking each Plaintiff's ability to establish at trial: (1) whether there was a prying into their seclusion, *i.e.,* whether they were videotaped; and (2) to the extent there was a prying, whether the prying was highly offensive or objectionable to a reasonable person. However, before analyzing these arguments for each of the remaining Plaintiffs, the Court must first address three issues IBP raises that potentially affect each Plaintiff's claim of intrusion upon seclusion: (a) between what dates was the camera in operation; (b) at what times during the day and/or night was the camera in operation; and (c) did IBP used the "least indiscriminate" form of surveillance, *see Brazinski,* 6 F.3d at 1183?

The record indicates that the camera was installed on or about October 15, 1997,

and it began operating on the 15th. Plaintiffs do not seriously contend that the camera began operating earlier than the 15th, and to the extent that they attempt to make this argument, there is no evidence in the record to support it. When the camera was taken out of commission, however, is a different story. IBP claims that the surveillance of the NMO stopped on October 25, 1997. Accordingly, it argues that any Plaintiff who claims to have been in the NMO after October 25 cannot, as a matter of law, prevail on an intrusion upon seclusion claim. However, the Court agrees with Plaintiffs that there is evidence from which a reasonable trier of fact could conclude that the taping did not end until October 29, 1997. By October 29, 1997, word had spread around the IBP Joslin plant that there was a camera in the NMO. Fred MaGee, a Plaintiff in this lawsuit, told Stearns, an IBP nurse, that he had been fired after being caught on camera going through a desk drawer in the NMO. (Stearns Dep. at 53). Acuff, an IBP nurse and Plaintiff in this lawsuit, testified during her deposition that she searched for and found the camera above the ceiling tiles on October 29, 1997. (Acuff Dep. at 41–42). She further testified that Stearns was with her when she found the camera. (*Id.*). The following morning, both Stearns and Acuff were called into Nimrick's office and terminated. (*Id.* at 50). Nimrick, according to Stearns, knew that she and Acuff had seen the camera the previous day. (Stearns Dep. at 66–67).

Because the camera was still in the ceiling of the NMO on October 29 and because Nimrick knew by the following morning that Acuff and Stearns had discovered it, a reasonable inference can be drawn that the camera was still recording on October 29, 1997.

The next general issue is: During what times of the day was the tape running? According to IBP, even if Plaintiffs can establish that they were in the NMO on one of the dates that the camera was installed, they must come forward with evidence demonstrating that they were in the NMO while the VCR was recording.

During her deposition, Koopman testified that when she was in charge of the surveillance, she started the record function on the VCR each morning between 10:30 and 11:00 a.m. (Koopman Dep. at 5–6). Bote, the senior security officer, testified that the tape "would run out approximately 3:00, 3:30 in the morning." (Bote Dep. at 23). Accordingly, viewing this evidence in the light most favorable to the non-moving party, the tape ran each day from approximately 10:30 a.m. to 3:30 a.m the following day.

However, in its Reply Brief, IBP argues that there were specific times each day that the VCR was running; therefore, each Plaintiff must pinpoint the date and time he/she was in the NMO. If the documentation IBP submits in support of this argument were admissible *and* conclusive, then perhaps its argument would have merit. In support of its argument, IBP relies on a memo prepared by Bote and Koopman on December 18, 1997, which was approximately two months after the camera was removed from the NMO and approximately one month after this case had been filed in state court. In the memo, Bote and Koopman set forth the alleged specific times the camera was running on each day between October 15 and 24, 1997.

During the class certification hearing, the Court did not allow the memo to come in as substantive evidence under the business records exception to the hearsay rule. (Class Cert.Hrg.Tr. at 87). IBP, in attempt to offer the memorandum as substantive evidence in support of its Motion, has made no attempt to change this Court's mind regarding its previous evidentiary ruling. Consequently, the Court will leave it to the trier of fact to determine at what specific times on specific days the camera was in operation and whether Bote's and Koopman's testimony on this issue is credible.

The next issue applicable to all Plaintiffs is IBP's argument that the method of surveillance chosen was the "least indiscrimi-

nate" possible for achieving a lawful and important objective. In *Brazinski,* the Seventh Circuit stated:

> [B]ut it can be argued that *if* the method of surveillance chosen is the least indiscriminate possible for achieving a lawful and important objective, the stranger whose privacy is incidentally and accidentally compromised . . . should not be heard to complain of the invasion of his privacy. . . .

*Brazinski,* 6 F.3d at 1183 (emphasis added). The key word in *Brazinski* is "if." In light of the fact that a wide angle lens was used in the camera (Bote Dep. at 18) and the camera picked up the desk, a filing cabinet, and two chairs where people sat in the NMO (Plt.Resp. to SUF, ¶ 8), a reasonable trier of fact could conclude that IBP did not use the least indiscriminate method of surveillance.[1] For example, in *Brazinski* the camera at issue was pointed towards the door of the locker room, rather than toward the interior of the room. *See Brazinski,* 6 F.3d at 1183. Although the Court offers no opinion concerning whether a camera must be focused solely on a door in order for a defendant to demonstrate that the least indiscriminate method of surveillance was used, it is not convinced, as a matter of law, that IBP used the least indiscriminate method.

The last issue applicable to all Plaintiffs is IBP's argument that because Bote and Koopman have testified that they did not see anyone receiving medical treatment (aside from soaking one's hands in water) or see anyone in a state of undress, none of the Plaintiffs can establish that they were caught on videotape.[2] Again, this argument is for the trier of fact to resolve at trial. In light of the fact that the tapes used by IBP *were recycled every other day* (Koopman Dep. at 10), a wide angle lens was used in the camera (Bote Dep. at 18), and the camera picked up the desk, a filing cabinet and two chairs where people sat in the NMO (Plt.Resp. to SUF, ¶ 8), a reasonable trier of fact could conclude that those Plaintiffs who have provided evidence that they were treated and/or examined in the NMO during the relevant period of time and time of day were, in fact, captured on videotape.

Accordingly, with the dates of October 15, 1997, through October 29, 1997, for the dates the camera was installed, and the times of 10:30 a.m. to 3:30 a.m. for the period time each day the VCR was potentially recording, the Court now turns to the remaining Plaintiffs' claims.

### a. Geri Acuff

The Court has already discussed Acuff's testimony at the class certification hearing that she was examined in the NMO at approximately 5:30 p.m. on October 15, 1997. However, IBP argues that when Acuff was deposed prior to the class certification hearing, she could not specify when she was examined in the NMO; therefore, summary judgment should be granted in its favor. The Court finds that Acuff sufficiently explained at the class certification hearing why she was then able to recall when she was examined in the NMO but could not recall during her deposition. She testified that after she was deposed, but prior to the class certification hearing, she had access to her IBP time cards and reviewed them. Based on her review of the time cards, she recalled that she returned to work from surgery on October 13, 1997, and further recalled that she was examined in the NMO two days after her surgery. (Class Cert.Hrg.Tr. at 21–22). Based on Acuff's testimony at the

---

1. Furthermore, the Court cannot overlook the fact that as a part of the class certification hearing, it reviewed 28 hours of tape recordings of the NMO. Although the Court is not fully familiar with the size of the room, the camera clearly picked up employees moving around the NMO, soaking their hands at the nurse manager's desk, using the filing cabi-net, and being interviewed by a nurse while sitting in the two chairs against the wall.

2. It appears that Nimrick also saw the part of the videotape where MaGee was rummaging through a desk drawer. However, Plaintiffs do not contend that Nimrick otherwise viewed the tapes.

class certification hearing, the Court finds that a reasonable trier of fact could conclude that she was examined in the NMO during the relevant time frame. The Court further finds that a reasonable jury could conclude that being videotaped with one's pants down while having the groin examined is highly offensive. Consequently, she may proceed to trial with her claim that her seclusion was intruded upon when her groin was examined in the NMO.

▮ Acuff further claims that she "occasionally" changed clothes at the end of her shift in the NMO and that her shift ended at approximately 1:00 a.m. (Acuff Add'l SUF, ¶ 2). However, "occasionally" changing clothes at the end of the shift falls short of the specificity required for a reasonable jury to find that she was captured on tape during the relevant time frame. Accordingly, the Court grants summary judgment in favor of IBP on Acuff's claim that her seclusion was intruded upon when she changed clothes in the NMO.

### b. Fred MaGee

▮ In its Motion for Summary Judgment, IBP argues that summary judgment should be granted in its favor on Fred MaGee's ("MaGee") claim of intrusion upon seclusion because during his deposition he could not recall when he was examined in the NMO. MaGee testified during his deposition that on two occasions he went to the NMO to have his knee checked and on both occasions had to pull his pants down to his knees. (MaGee Dep. at 14). When asked what days he was in the NMO, he stated that he did not know but that the information was put into the computer. (*Id.*). Later during his deposition, he testified that on one of the occasions he was examined in the NMO, Stearns, an IBP nurse, and McCarter ("McCarter"), the nurse manager, were present. (*Id.* at 48–49). Although a lack of knowledge as to when one was in the NMO could be fatal to a Plaintiff's claim in this case, it is not fatal to MaGee's claim. In his Response to the Motion for Summary Judgment, he submits records from IBP's Health Ser-

vices Department to which he refers in his Statement of Additional Undisputed Facts. One of the records indicates that on October 20, 1997, he was examined by Stearns for complaints of intermittent pain in his left knee. (Plt.Ex.M). The examination took place at approximately 6:12 p.m., which is consistent with MaGee's testimony that he was examined during second shift between 6:00 p.m. and 8:00 p.m. (Plt.Ex. M; MaGee Dep. at 59). Accordingly, based on MaGee's deposition testimony and his medical records from IBP, a reasonable jury could conclude that he was examined in the NMO during the relevant time frame. The Court further finds that a reasonable jury could conclude that the videotaping of MaGee while having his knee examined with his pants down around his ankles is highly offensive.

### c. Chris Liras

▮ During his deposition, Chris Liras ("Liras") testified that he was examined in the Health Services Department on four different occasions between September and October, 1997, for pain arising from a hernia. (Liras Dep. at 28–41). The following colloquy took place between opposing counsel and Liras regarding the issue of what room he was in for his four examinations:

A The only thing I can remember, I go two times on this place.

Q For the record, what you're saying is two times to the examining room?

A Yeah. And I'm sure here. It was one time—I'm sure it was one time, but I'm not sure it was two times or—you know, I didn't pay attention, you know, what room I was.

Q When you were just providing the answer that you gave, you were pointing at the nurse's office; is that correct?

A Yes.

Q So then if we were to go through again all four times that you were examined, you wouldn't be able to

tell me for a particular examination where you were in the Health Services Department because you were seen in different places; is that correct?

A Yeah, but I'm sure two times, on September 6th and 8th, I was seen in this examinat[ion] room. The other two times, I'm not sure.

(Liras Dep. at 41).

 ■■■■■ In his subsequent affidavit, Liras now states, "I specifically remember being examined by Jackie Webster in the [NMO] on October 27, 1997." (Liras Aff, ¶ 1).[3] "A subsequent affidavit may be used to clarify ambiguous or confusing deposition testimony, or it may be based on newly discovered evidence.... But where there is no explanation of the conflict, self-serving, contradictory affidavits ... cannot create a disputed issue of material fact." *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1297 (7th Cir.1993). Liras fails to explain how he can now "specifically remember" that he was examined in the NMO on October 27, but could not do so during his deposition. Accordingly, his claim in his affidavit that he was examined by Jackie Webster in the NMO on October 27, 1997, is self-serving and is disregarded by the Court.

He also states in his affidavit that he remembers being examined by Jackie Webster in the NMO on a previous occasion. He further states, "I honestly don't remember the date this occurred but after reviewing the computer entries which indicate I saw Jackie Webster on October 21, I *believe* that is the correct date." (Liras Aff., ¶ 5) (emphasis added). If he is unable to state with certainty in his affidavit that he was seen in the NMO on the 21st

after refreshing his recollection, the Court presumes that he will be unable to state this alleged fact with certainty when called to testify. *See* Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge....").

Because Liras' affidavit is self-serving with respect to the October 27, 1997, date and because he is unable to state with certainty that he was seen in the NMO on October 21, 1997, he has failed to come forward with evidence from which a reasonable trier of fact could conclude that he was examined in the NMO during the relevant time frame. Accordingly, summary judgment is entered in favor of IBP on Liras' claim of intrusion upon seclusion.

### d. Cheryl Cowan

 ■■■ IBP argues in its Memorandum in Support that Cheryl Cowan's ("Cowan") claim of intrusion upon seclusion must be dismissed because she cannot offer competent evidence that she was videotaped and any taping of her was not offensive because it did not involve her in any state of undress. During her deposition, Cowan testified that she is a diabetic and injected herself with insulin shots four times per day. Twice a day, at 9:00 a.m. and 1:00 p.m., she would give herself shots during her shift at IBP. (Cowan Dep. at 14). In her affidavit, she states that she would administer insulin shots to herself in the NMO and did so between October 15, 1997, and October 29, 1997. (Cowan Aff., ¶ 5).[4] To give the shot, she would have to pull up her shirt or roll down her pants to administer a shot in the stomach or thigh, respectively. (Cowan Dep. at 20–21).

---

**3.** Liras previously submitted an affidavit that was ambiguous. The Court gave him leave to file a clarifying affidavit that would supersede his previously filed affidavit. (September 29, 1999, Minute Order). Because his clarifying affidavit supersedes his original affidavit, the Court will not rely on the original affidavit in any manner for purposes of his Response to the Motion for Summary Judgment.

**4.** Cowan previously submitted an affidavit that was ambiguous. The Court gave her leave to file a clarifying affidavit that would supersede his previously filed affidavit. (September 29, 1999, Minute Order). Because her clarifying affidavit supersedes her original affidavit, the Court will not rely on the original affidavit in any manner for purposes of her Response to the Motion for Summary Judgment.

Because Cowan has stated that she gave herself shots in the NMO during the relevant period of time and because there is evidence that the camera was in operation at 1:00 p.m. when Cowan administered the second shot each day at work, there is a disputed issue of material fact concerning whether Cowan was captured on videotape. Furthermore, the Court finds that a reasonable trier of fact could conclude that being videotaped while administering insulin shots to oneself in the stomach or thigh is highly offensive. Therefore, she may proceed to trial on her intrusion upon seclusion claim with regard to her insulin shots.

Cowan also claims that she iced her hands between October 15, 1997, and October 29, 1997, and that she did so three or four times each day. (Cowan Aff., ¶ 6). On some of these occasions, she allegedly iced her hands in the NMO. (*Id.*, ¶ 7). Even assuming the trier of fact could conclude that being videotaped while icing one's hands is highly objectionable or offensive, Cowan has failed to come forward with any evidence indicating that she iced her hands in the NMO during the relevant time of the day. Consequently, she may not proceed to trial with her claim of intrusion upon seclusion with regard to her ice treatments.

### e. Sharee Murphy

In Response to IBP's Motion for Summary Judgment, Sharee Murphy ("Murphy") has submitted an affidavit stating that she was examined in the NMO. She states that "[o]n two occasions I went to the [Health Services Department] for chest pains[,] and I was taken to the NMO to be examined." (Murphy Aff., ¶ 4). She further states, "I do not remember the exact dates I was seen in the [NMO], but, I am certain that both exams take [sic] place between October 15, 1997 and October 31, 1997, in the evening during second shift." (*Id.*, ¶ 5).

Murphy's affidavit conflicts with her previous deposition testimony, which provides, in relevant part:

Q Were you in the Health Services Department one time or more than one time for chest pains?

A Twice.

Q *When did that occur?*

A *I can't remember.*

Q *Do you recall the month in which it occurred?*

A *Nope.*

(Murphy Dep. at 14) (emphasis added). Murphy has not attempted to explain the conflict between her deposition testimony and subsequent contradictory affidavit. Hence, the Court enters summary judgment in favor of IBP on her claim of intrusion upon seclusion. *See Slowiak,* 987 F.2d at 1297.

### f. Bobby Jo Barker

Bobby Jo Barker's ("Barker") claim for intrusion upon seclusion fails because he admitted during the deposition that he has not experienced any emotional distress as a result of allegedly being videotaped. During his deposition the following colloquy took place:

Q Have you experienced any emotional distress as a result of a camera being in the Health Services Department?

A Mentally, no, because I don't know for a fact that it was there; but it's still in the back of my head, the thought that it might have been there.

(Barker Dep. at 40). Barker was deposed on November 18, 1998, which is over a year after the camera was discovered. The Court has little trouble concluding that if Barker had not experienced any emotional distress by November 18, 1998, a reasonable trier of fact could not conclude that he suffered and anguished over being videotaped in the NMO.

### g. Theresa Carbo

IBP argues in its Memorandum in Support that Theresa Carbo ("Carbo") cannot offer competent evidence that she was ever videotaped. During her deposition, she

testified that she could not state with certainty on what days in October of 1997 she was in the Health Services Department to have her upper extremities and knee examined. (Carbo Dep. at 29). She further testified that when she was examined in the Health Services Department, the examination generally occurred by 8:00 to 8:30 a.m., but when her shift was short-handed, she would have to wait until towards the end of her shift, which ended around 2:15 to 2:30 p.m. (*Id.* at 32, 42).

In her affidavit, which was prepared subsequent to her deposition, she now states with certainty when she was examined in the NMO. She states that she was examined in the NMO for both her hand and her knee between October 15, 1997, and October 30, 1997, toward the end of her shift. (Carbo Aff., ¶ 3). However, what she fails to explain is the basis for her newly found knowledge of what days she was examined in the NMO. At least some of the Plaintiffs in this case have stated in their subsequent affidavits that they reviewed medical records and/or sign-in logs from the Health Services Department, thereby implying that their newly found knowledge was based on refreshing their recollection. However, Carbo's affidavit is silent regarding whether she even reviewed her records before she prepared her subsequent affidavit.

Nevertheless, if her medical records create an inference that she was seen in the NMO during the relevant time frame and relevant times of the day, then she could survive summary judgment. However, her records do not create such an inference. The Court initially notes that Carbo does not even attempt to explain how the medical records support such an inference. In fact, they are not referred to in her Response to the Motion for Summary Judgment, affidavit, or Statement of Additional Undisputed Facts. Nevertheless, giving Carbo the benefit of the doubt, the Court has examined her medical records, and based on the face of those records has concluded: (1) on October 15, she went to the NMO between 7:50 a.m. and 8:10 a.m.; (2) on October 16, she went to the NMO at

9:40 a.m. and left at 10:00 a.m.; (3) on October 17, she went to the NMO at 9:14 a.m. and left at 9:49 a.m.; (4) on October 21, she went to the NMO at some time prior to 5:38 a.m. and then again at 8:10 a.m.; on her second visit that day, she left the NMO at 8:55 a.m.; she was also examined by Julie DeCoster, an IBP nurse, during her second visit; and (5) on October 26, she went to the NMO at approximately 5:30 a.m. Accordingly, her medical records that she submits to support her claim reveal that she was seen in the Health Services Department a total of six times between October 15 and October 26, 1997. Even though these dates fall within the relevant period time in which the camera was installed, the time of day she was in the Health Services Department on each of her visits was before 10:30 a.m., which is the earliest the VCR was turned on each day.

Accordingly, IBP correctly argues that Carbo cannot establish that she was ever videotaped. All we have is her self-serving affidavit with no plausible explanation for her newly found knowledge of when she was examined in the NMO and various medical records that establish, at best, that she was somewhere in the Health Services Department during times of the day when the VCR was not recording. Consequently, summary judgment is entered against Carbo and in favor of IBP.

### h. Thomas Walls, Jr.

 IBP argues that Thomas Walls, Jr. ("Walls"), does not know when he was in the NMO and, therefore, cannot competently testify that he was ever in the NMO during the relevant time frame. During his deposition, the following colloquy took place:

Q You mentioned times when you were in the Health Services Department to have your back examined.

A (Witness nodded head affirmatively)

Q How many times total do you believe that happened?

A I don't know, probably 20 times.

Q And of those 20 times, do you recall how often you were in each of the locations where you've put an X?[5]

A It's hard to—*I couldn't even begin to know how many, you know, which ones I was in more or what.*

Q You mentioned a time that you had to take your pants off to have your lower back examined. Do you know the location you were in when that occurred?

A *I can't remember which office I was in for which.*

Q Is there anything that would help you recall?

A I doubt it.

(Walls Dep. at 18) (emphasis added).

However, in his affidavit prepared subsequent to his deposition, he now claims that he was seen in the NMO on October 17, 1997, and October 22, 1997, after 11:00 a.m. on each of these dates. (Walls Aff., ¶ 2). He states that he was having his back and hands examined. Although far from artfully stated in his affidavit (which appears to have been drafted by counsel), it appears he is claiming that his recollection was refreshed by examining the sign-in logs from the Health Services Department. The sign-in logs, which are filled out by the employees, do not indicate in which room employees were examined. The logs, assuming they are properly filled out by the employee, state the employee's name and department, time in, time out, and purpose of visit. (*See, e.g.,* Plt.Ex. H).

IBP argues that because the logs do not indicate in what room the employee was examined, there is no way that the logs refreshed his recollection that he was examined in the NMO on October 17th and 22nd. This argument is not without merit,

as it is certainly appropriate to question how Walls' recollection was refreshed from the sign-in logs that: (1) are silent with respect to which room(s) he was examined in; and (2) indicate that he was in the Health Services Department for "Advil," not an examination. (Plt.Ex.H). However, IBP's argument raises a credibility issue that cannot be properly resolved at the summary judgment stage. Consequently, the Court leaves it to the finder of fact to determine how Walls' refreshed his recollection and to ultimately determine whether Walls was actually in the NMO during the relevant time frame. Furthermore, the Court will leave it to the finder of fact to determine whether being videotaped while having one's hands and back examined is highly offensive or objectionable.

### i. Myrna Rodriguez

In its Memorandum in Support, IBP argues that Myrna Rodriguez's ("Rodriguez") claim for intrusion upon seclusion must be dismissed because she cannot offer competent evidence that she was videotaped and, assuming she can offer such evidence, the alleged intrusion was not offensive or objectionable. In her affidavit, Rodriguez states that she was examined in the NMO on October 18, 1997, between 12:30 p.m. and 2:30 p.m. (Rodriguez Aff., ¶ 2).[6] She further states that on this occasion she was in the NMO "for a recheck of [her] tendonitis problems with [her] left wrist. . . ." (*Id.*).

If true, her affidavit supports a conclusion that she was in the NMO during the relevant period and time of day, which, in turn, supports a conclusion that a reasonable trier of fact could find that she was captured on videotape during her examination. A much closer question is presented

---

**5.** During his deposition, Walls drew a schematic of the Health Services Department as he remembered it and placed an "X" in each room where he received treatment while employed at IBP.

**6.** Rodriguez previously submitted an affidavit that was ambiguous. The Court gave her

leave to file a clarifying affidavit that would supersede her previously filed affidavit. (September 29, 1999, Minute Order). Because her clarifying affidavit supersedes her original affidavit, the Court will not rely on the original affidavit in any manner for purposes of her Response to the Motion for Summary Judgment.

by IBP's argument that Rodriguez cannot establish that the alleged intrusion was offensive or objectionable. The basis of IBP's argument is that because Rodriguez was not in a state of undress, either partially or totally, any videotaping of her was not offensive. However, the Court does not believe that one must necessarily be either partially or fully undressed for a videotaping of a medical exam to be highly offensive or objectionable. Of course, this conclusion does not necessarily mean that being videotaped while having one's wrists examined is highly offensive or objectionable. The Court is left with undeveloped and perfunctory arguments from both parties on this issue. Consequently, it will leave it to the trier of fact to determine whether the alleged intrusion upon Rodriguez's seclusion was highly offensive or objectionable.

### j. Blaz Rosales

■ Blaz Rosales ("Rosales") suffered from a hernia while working for IBP. During his deposition, Rosales was asked how many times during the course of his employment he had been either partially or fully unclothed in the Health Services Department. Rosales replied, "Three times...." (Rosales Dep. at 28). He was subsequently asked by defense counsel, "For the times that [you] identified as having been checked—meaning physically checked—in the Health Services Department, all of those were in 1996; is that correct?" (*Id.* at 29). After a few clarifying questions, Rosales testified that he was physically checked in the Health Services Department four times between 1996 and 1997, but he did not remember the month in which he was checked in 1997. In its Memorandum in Support, IBP argues that summary judgment is appropriate since Rosales does not know when he was checked in the Health Services Department in 1997.

In his Response, Rosales offers an affidavit, prepared after his deposition, in which he states that he was seen in the Health Services Department on many occasions between October 15, 1997 and October 30, 1997. More specifically, he states:

2. I am sure I received treatment in the [NMO] between October 15, 1997, and October 30, 1997.

3. According to the Sign–In Logs which I have reviewed, I was seen in or treated in the [Health Services Department] on 10/15/97 twice, 10/17/97, 10/24/97, 10/27/97, 10/28/97 twice, and 10/29/97. On each of these occasions I had to have my hernia checked.

4. In order for my hernia to be checked I was taken into the [NMO] and had to remove or pull down my pants.

(Rosales Aff., ¶¶ 2–4).

It would be an understatement to say that there is a substantial difference between his deposition testimony and his affidavit. He goes from testifying during his deposition that he was examined four times over period of two years to stating in his affidavit that he was examined eight times over a period of two weeks. It appears that the basis for his newly found knowledge comes from his review of the sign-in logs. Like Walls' affidavit, Rosales' affidavit is highly questionable. On the sign-in logs that he filled out and that he now claims refreshed his recollection, Rosales stated that the purpose of his many visits was "Tylenol." (Plt.Ex.J). This serious credibility issue, and ultimately the issue of whether Rosales was in the NMO for any of his hernia checks, will have to be resolved by the finder of fact.

IBP also argues that summary judgment must be granted against Rosales because during his deposition he identified the areas in the Health Services Department where he had been examined and the NMO is not one of those areas. During his deposition, he was asked to draw a diagram of the Health Services Department and place a mark in those rooms where he had been examined. By one of the rooms he placed a question mark, indicating that he did not know what the room was used for. (Rosales Dep. at 18). A review of the diagram Rosales drew and

the deposition transcript raises a question of whether Rosales was really ever in the NMO, thereby raising a question of whether his affidavit is contradictory to his deposition testimony. Nevertheless, a review of Rosales' diagram and the relevant portions of the deposition transcript reveals that IBP's counsel did not make a very good record concerning what rooms Rosales was in or not in while he worked at IBP. Absent from the diagram or the relevant portion of the transcript are the terms "NMO," "Nurse Manager's Office," or any other word commonly used by IBP employees to describe the NMO. Consequently, while there is certainly a serious question whether Rosales has ever been in the NMO, it is a question not conclusively answered by the record before the court.

In conclusion, Rosales, by the thinnest of margins, has survived summary judgment.

### k. Florene Branham

During her deposition, Florene Branham ("Branham") testified that she was partially undressed in the NMO to have her back examined during the first week of November, 1997, and the last week of October, 1997. Clearly, she has no cause of action for intrusion upon seclusion for the examination that took place during the first week of November since the camera was no longer installed at that time. When asked at her deposition on what day she was examined in the NMO during the last week of October, she replied, "I'm not sure of the date. I know it was between the 25th of October and the 1st of November...." (Branham Dep. at 36). In Response to the Motion for Summary Judgment, Branham offers a sign-in log from October 28, 1997, to demonstrate that she was in the NMO on that date. Absent from the Response is an affidavit from Branham in which she states that after reviewing the sign-in log she now

knows that she was seen in the NMO on October 28, 1997. However, the lack of an affidavit is not necessarily fatal to her claim if a reasonable inference could be drawn from the sign-in log that she was seen in the NMO on that date. Nevertheless, a review of the sign-in log reveals that Branham was somewhere in the Health Services Department on that date at approximately 5:15 p.m. for "Tylenol." Consequently, a reasonable inference cannot be drawn from the sign-in log that Branham was seen in the NMO on October 28, 1997, to have her back examined. Therefore, she is left with her deposition testimony, which also falls short of establishing that she was in the NMO during the relevant time frame. Accordingly, the Court grants summary judgment in favor of IBP on Branham's claims.

### I. Myrna Ruiz

■ IBP argues that Myrna Ruiz's ("Ruiz") claim of intrusion upon seclusion must be dismissed because she cannot offer competent evidence that she was captured on videotape. IBP further argues that assuming she can offer such evidence, she cannot show that the alleged videotaping of her medical treatments was objectionable or offensive. During her deposition, Ruiz testified that she was seen in the NMO a number of times during the month of October, 1997, but could not recall specific dates. In her affidavit, which was prepared after her deposition, she specifies the dates (and in some instances the times) that she was allegedly in the NMO. Although she does not state in her affidavit exactly how she now recalls the specific dates, it appears that she reviewed sign-in logs from IBP.[7] In her affidavit she states:

> 3. I had my back evaluated or treated on October 17 and 23, 1997 by a nurse. These [evaluations] ... occurred

---

7. Ruiz previously submitted an affidavit that was ambiguous. The Court gave her leave to file a clarifying affidavit that would supersede her previously filed affidavit. (September 29, 1999, Minute Order). Because her clarifying affidavit supersedes her original affidavit, the Court will not rely on the original affidavit in any manner for purposes of her Response to the Motion for Summary Judgment.

in the [NMO], and I had to take my shirt off for these examinations.

(Ruiz Aff., ¶ 3).[8] However, what she fails to specify is at approximately what time she was examined on these days. Since her shift at IBP ran from 6:00 a.m. to 2:30 p.m., this means that approximately five hours of her shift passed each day before the videotape was in operation. By not specifying whether these back evaluations took place before or after 10:30 a.m., she has failed to come forward with evidence from which a reasonable trier of fact could conclude that her back was examined during the relevant time period each day. Accordingly, she may not proceed to trial with her claim that her seclusion was intruded upon when her back was evaluated on October 17 and 23, 1997.

She further states in her affidavit:

4. I also put heat on my back on October 25, 27, 28, and 29, 1997. The sign in [sic] log indicates that these occurred between 9:00 a.m. – 12:00 p.m. Most of these treatments also occurred in the [NMO].

(Ruiz Aff., ¶ 4). This statement is somewhat vague. A review of the various sign-in logs reveals that she received hot water treatments twice a day on these dates, once at 9:00 a.m. and once at approximately 12:00 p.m., for a total of 8 treatments. By stating "[m]ost of these treatments . . . occurred in the NMO," the Court believes that it is reasonable to infer that at least 1 of her 8 heat treatments occurred while the VCR was running since "most" implies more than 50% of her 8 treatments. Accordingly, despite the ambiguity in her affidavit, the Court finds that she has created a disputed issue of material fact as to whether at least one of her eight heat treatments was captured on videotape. The Court, however, expresses its displeasure with the ambiguity in Ruiz's affidavit, given the fact that this affidavit was supposedly submitted to clarify ambiguities in her original affidavit.

Ruiz also states in her affidavit that she was seen in the NMO at 11:45 on October 28, 1997, to undergo strength testing of her wrists. (Ruiz Aff., ¶ 3). Accordingly, she has created a disputed issue of material fact as to whether she was seen in the NMO for her wrists on this date and, therefore, whether she was videotaped.

■ The question remains, however, whether a reasonable trier of fact could conclude that being videotaped while receiving heat treatments and/or undergoing strength testing of one's wrists are/is highly offensive. Like the argument made by IBP concerning the same issue with Rodriguez's claim of intrusion upon seclusion, both parties' arguments are undeveloped and perfunctory. Therefore, the Court will leave it to the trier of fact to determine whether being videotaped while undergoing heat treatments and/or undergoing strength testing is highly offensive.

In summary, Ruiz may proceed to trial with her claim that her seclusion was intruded upon when she was allegedly videotaped while receiving heat treatments on her back and when she underwent strength testing on October 28, 1997, on her wrists. She may not proceed to trial with her claim that her seclusion was intruded upon when she had her back evaluated at some unspecified time of day on October 17 and 23, 1997.

### m. Candice Christianson

■ In her affidavit, Candice Christianson ("Christianson") states that on October 17, 1997, at approximately 3:00 p.m., she was in the NMO with Acuff, who wanted to check Christianson's neck for swelling. (Christianson Aff., ¶ 4). Christianson removed her shirt and was subsequently examined. (Id.). IBP argues she does not create a disputed issue of material fact because Bote and Koopman's memorandum of two months later shows that the camera was not in operation at 3:00 p.m.

---

8. There are two paragraphs numbered "3" in her affidavit. The paragraph quoted here is the second number 3.

on October 17, 1997. The Court has already discussed the probative value of this document and will not discuss it any further. Christianson has created a disputed issue of material fact as to whether she was in the NMO during the relevant time frame. Furthermore, the Court finds that a reasonable trier of fact could conclude that being videotaped while having one's neck examined with one's shirt removed is highly objectionable and/or offensive. Accordingly, Christianson may proceed to trial with her claim of intrusion upon seclusion.

## C. Implied Causes of Action

■ Under Illinois common law, implication of a private right of action is appropriate only if:

(1) plaintiff is a member of the class for whose benefit the Act was enacted; (2) it is consistent with the underlying purpose of the Act; (3) plaintiff's injury is one the Act was designed to prevent; and (4) it is necessary to provide an adequate remedy for violations of the Act.

*Corgan v. Muehling,* 143 Ill.2d 296, 158 Ill.Dec. 489, 574 N.E.2d 602, 609 (1991). In their Second Amended Complaint, Plaintiffs allege that IBP violated the Illinois Nursing Act, 225 ILCS 65/10–5, *et seq.,* and the Illinois Code of Civil Procedure, 735 ILCS 5/8–802, by videotaping the NMO. Plaintiffs further request that this Court recognize an implied cause of action in these statutes since the legislature did not explicitly provide for a civil remedy.

■ The Court finds that there cannot possibly be an implied cause of action under 735 ILCS 5/8–802 since the Illinois Supreme Court held that the Civil Justice Reform Act of 1995, Public Act 89–7, which included this procedural provision at issue, was unconstitutional in its entirety. *See generally Best v. Taylor Machine Works,* 179 Ill.2d 367, 228 Ill.Dec. 636, 689 N.E.2d 1057 (1997). Accordingly, despite whatever merit there may be to implying a private right of action in an Illinois *procedural provision,* the Court cannot do so in light of the supreme court's pronouncement in *Taylor.*

Perhaps aware of the problem of implying a private right of action in this (or any other) procedural provision, Plaintiffs now argue in their Response to the Motion for Summary Judgment that there is an implied private cause of action in the Medical Patient Rights Act ("MPRA"), 410 ILCS 50/0.01, *et seq.* The Court expresses no opinion on whether Plaintiffs might have an implied cause of action under the MPRA since they failed to plead in their Second Amended Complaint that IBP violated this Act. Furthermore, they have not sought leave of the Court to amend their Second Amended Complaint to include any such allegation.

■ The Court now turns to Plaintiffs' contention that IBP violated the Illinois Nursing Act and, therefore, that they should be able to pursue an implied cause of action under the Act. According to Plaintiffs, the Illinois Nursing Act "makes disclosure of patient information criminal." (Plt.Resp. at 6) (citing 225 ILCS 65/10–5(*o*)). The Court initially notes that the provision cited by Plaintiffs, § 10–5(*o*), does not state anything about making disclosures of patient information criminal. Section 10–5(*o*) provides, "No person shall . . . [o]therwise intentionally violate any provision of this Act." Nevertheless, assuming the Nursing Act criminalizes the disclosure of patient information, there is no evidence in the record that any confidential patient information was disclosed in this case unless the alleged unauthorized intrusion by IBP also constitutes a disclosure of patient information by IBP. However, Plaintiffs do not attempt to explain in their Response to the Motion for Summary Judgment how a disclosure of confidential information occurred in this case or to explain if and under what circumstances an intrusion also constitutes a disclosure. *See United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir.1991) (perfunctory and undeveloped arguments are waived).

The Court also wants to make clear that perhaps there are other provisions under the Nursing Act that IBP allegedly violated when it videotaped the NMO. However, Plaintiffs only cite to 225 ILCS 65/10–5(*o*). It is Plaintiffs' job, not the Court's, to point out what provision(s) was/were allegedly violated by IBP in this case. A citation to the "otherwise intentionally violates" language of § 10–5(*o*) falls well short of meeting this standard.

### IV. Conclusion

For the foregoing reasons, IBP's Motion for Summary Judgment [# 120–1] is GRANTED IN PART and DENIED IN PART. The parties' Motions for Oral Argument [# 123–1, # 144–1] are DENIED.

IT IS HEREBY ORDERED that summary judgment is granted in favor of IBP and against Plaintiffs on Section IV of the Second Amended Complaint (Implied Causes of Action);

IT IS FURTHER ORDERED that summary judgment is granted in favor of IBP and against the following Plaintiffs on the claim of intrusion upon seclusion: (1) Aaron Youngberg; (2) Randy Vinson; (3) Servio Mercado; (4) Patsy Boyer; (5) Condillard Howard; (6) Shari Myles; (7) Chris Liras; (8) Sharee Murphy; (9) Bobby Jo Barker; (10) Theresa Carbo; and (11) Florene Branham.

IT IS FURTHER ORDERED that Plaintiffs' request to dismiss the following people is DENIED since they were never named as Plaintiffs in this lawsuit: (1) Eric Taylor; (2) Guy Thompson; and (3) Debra Baker;

IT IS FURTHER ORDERED that Julie Stearns may not proceed to trial since she was never named as a Plaintiff in this case.

The Court will contact the parties to schedule a telephone status call. During the call, the Court will set a Final Pre-Trial Conference, a schedule for addressing the severance issue(s), and a cut-off for the completion of damages discovery. The Court fully expects that the parties will commence damages discovery at this time

now that the Motion for Summary Judgment has been ruled upon. IBP should also feel free not to wait on the telephone status call to file a motion concerning the severance issue(s).