**Michelle BRAZINSKI, et al.,**
**Plaintiffs–Appellants,**

**v.**

**AMOCO PETROLEUM ADDITIVES COMPANY and Buck Isbell,**
**Defendants–Appellees.**

No. 92–3176.

United States Court of Appeals, Seventh Circuit.

Argued April 29, 1993.

Decided Sept. 9, 1993.

John T. Papa, Callis Law Firm, Granite City, IL (argued), for plaintiffs-appellants.

Thomas C. Walsh (argued), Rebecca Jackson, Sabrina M. Wrenn, Bryan Cave, St. Louis, MO, Neil L. Brilliant, Amoco Corp., Chicago, IL, for defendants-appellees.

Before POSNER, FLAUM, and KANNE, Circuit Judges.

POSNER, Circuit Judge.

This case began as a suit for damages brought in state court by eight female workers who complained that they had been subjected to video surveillance in violation of their tort right of privacy. Arguing that the suit actually arose not under state tort law but under section 301 of the Taft–Hartley Act, 29 U.S.C. § 185, because it required interpretation of a collective bargaining agreement, the company removed the case to federal district court, then moved for summary judgment on the ground that the plaintiffs had failed to file a grievance within the thirty days allowed by the collective bargaining agreement and having thus failed to exhaust their remedies under the agreement were not entitled to recover anything under it. The district judge, without any explanation, remanded the case to state court. The company sought mandamus from us, and we ordered the judge to retain the case—because we thought that it was indeed a section 301 case despite the plaintiffs' attempt to plead it as a state-law tort action—and to consider the company's motion for summary judgment. *In re Amoco Petroleum Additives Co.*, 964 F.2d 706 (7th Cir.1992). The judge then granted the motion on the ground originally urged by the company and dismissed the suit, precipitating this appeal. The procedural history is a little more complicated than we have made out and there is an additional defendant (the company em-

ployee who instituted the surveillance), but these details can be ignored.

■ The plaintiffs make two arguments. The first, applicable to all of them, is that the filing of a grievance would have been a futile act and therefore was not required. The company's response is that in so arguing the plaintiffs are attempting to reopen issues settled by our previous decision, which established the law of the case. *Williams v. Commissioner*, 1 F.3d 502, 503–04 (7th Cir.1993). The company is correct. The previous decision held, first, that if a worker brings a suit the merits of which cannot be determined without interpretation of the collective bargaining agreement, that suit, however pleaded, is deemed to arise under section 301 of the Taft–Hartley Act (or under the Railway Labor Act, if the employer is governed by that act); and second, that this suit is of that character. Section 301 creates a remedy for breach of a collective bargaining agreement. If this suit is deemed to arise under section 301, it is a suit for such a breach. When as in this case the collective bargaining agreement establishes a grievance procedure for processing claims of breach, with arbitration if the grievance procedure does not produce a satisfactory result, and the union is cast in the role of representative of the aggrieved worker in the grievance and arbitration processes, the worker cannot prevail in his section 301 suit merely by showing that his grievance is a just one. That is, he cannot show just that the company violated the collective bargaining agreement. He must also show that by arbitrarily refusing to press his grievance the union violated its duty to represent all members of the bargaining unit fairly. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652–53, 85 S.Ct. 614, 616–17, 13 L.Ed.2d 580 (1965); *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 62, 101 S.Ct. 1559, 1563–64, 67 L.Ed.2d 732 (1981).

■ No violation of the duty of fair representation is claimed here. All that the plaintiffs mean by calling the filing of a grievance "futile" is that they don't think their claim rests on the collective bargaining agreement, and therefore—since the grievance procedure is limited to claims of breach of the agreement—a grievance *is* a claim of such breach—they don't think they could possibly get anything by filing a grievance. But in light of our first decision this is tantamount to a concession that the plaintiffs have no section 301 claim, since such a claim is necessarily founded on the collective bargaining agreement; the only jurisdiction conferred by section 301 is jurisdiction to enforce labor contracts. Concession or not, the failure to file a grievance within the thirty-day deadline fixed by the agreement extinguished the plaintiffs' rights under it, as they have no basis for claiming that the failure was attributable to an arbitrary or otherwise wrongful decision by the union not to represent them.

■ The problem with this logically impeccable analysis is that it seems to create an arbitrary gap in legal protection. Michael C. Harper, "Limiting Section 301 Preemption: Three Cheers for the Trilogy, Only One for *Lingle* and *Lueck*," 66 *Chi.–Kent L.Rev.* 685, 709–13 (1990). The plaintiffs have a tort claim that they could press in state court if there were no collective bargaining agreement. We seem to be saying that somehow by virtue of the agreement the claim is extinguished simply because the agreement fails to create any contractual right of privacy in substitution for the tort right. The reason that the suit is deemed to arise under section 301 is not that the collective bargaining agreement gives the plaintiffs a contract claim in lieu of their tort claim but that the company has a nonfrivolous argument that the surveillance of which the plaintiffs complain is authorized, albeit implicitly, by the management-rights clause of the agreement, so that the plaintiffs' claim that the surveillance invaded their privacy cannot be resolved without an interpretation of the agreement. *Schlacter–Jones v. General Telephone*, 936 F.2d 435, 439 (9th Cir.1991). An arbitrator or grievance committee might determine that the management-rights clause did not authorize the surveillance yet reject the plaintiffs' grievance anyway on the ground that the surveillance did not violate any right that the agreement conferred on them, the union having failed to foresee and negotiate for contractual protection of the workers' privacy.

■ One might have supposed that this gap in legal protection could be closed by invoking, in lieu of preemption, the concept of exhaustion of remedies, a concept frequently invoked in the labor setting because of the unhappy history of judicial intervention in labor disputes. On this view, the plaintiffs have a claim under state tort law and they properly sued upon it in state court; the company had a possible defense, based on the collective bargaining agreement; since it was a defense, it could not be used to remove the case to federal court, *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 398–99, 107 S.Ct. 2425, 2432–33, 96 L.Ed.2d 318 (1987), but it could be used as the basis for referring the case to the grievance machinery that the collective bargaining agreement had made the authorized mode of resolving disputes over interpretation. If the reference was made and the arbitrator or other authorized decision-maker determined that the collective bargaining agreement neither authorized the conduct of which the plaintiffs complained nor provided them with any remedy, this would establish that their claim neither was barred by the collective bargaining agreement nor arose under it. Not arising under it, their claim would not be a claim under section 301 and they would be free to pursue their state law remedies. The danger of a collision between state tort law and the regulation of labor relations by collective bargaining agreements would be avoided.

■ The Supreme Court appears, however, to have addressed the problem of the remedial gap in a different way. The rule seems to be that if the plaintiff's claim, ostensibly based on state law, cannot be adjudicated without interpretation of the collective bargaining agreement, the claim turns into a federal claim that the agreement itself has been violated. *Lingle v. Magic Chef,* 486 U.S. 399, 411, 108 S.Ct. 1877, 1884, 100 L.Ed.2d 410 (1988); *United Steelworkers of America v. Rawson,* 495 U.S. 362, 368–72, 110 S.Ct. 1904, 1909–11, 109 L.Ed.2d 362 (1990). It does not turn into a claim that some federal common law right of employees (a right of privacy, for example) has been violated. For while there is much talk in the cases of judicial responsibility to create a federal common law *of collective bargaining agreements* under section 301, see, e.g., *id.* at 368, 110 S.Ct. at 1909, the qualification that we have italicized is crucial. The common law to be made is a common law of contracts, not a source of independent rights, let alone tort rights; for section 301 is as we have said a grant of jurisdiction only to enforce contracts. The *Caterpillar* case was special because the plaintiffs were suing on the basis of individual employment contracts not alleged to have been somehow extinguished by or absorbed into the federal law of collective bargaining agreements.

So the remedial gap remains—maybe intentionally. Maybe the idea is that if a matter is one that the parties could regulate by contract (as they could not, if the matter involved the state's paramount interest in preventing violence, *Farmer v. United Brotherhood of Carpenters,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), or was a matter that Congress wanted the courts to decide, *McDonald v. West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984)), they ought to do so. (Sometimes they do do so. *Miller v. County of Glacier,* 257 Mont. 422, 851 P.2d 401 (1993).) The analogy is to the principle of *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), that the National Labor Relations Act preempts claims either arguably prohibited or arguably permitted by the Act, thus leaving a large area of no law for the Labor Board to fill. Here the no-law area would be for the parties to fill in the collective bargaining agreement.

This is not the case in which to try to dispel these mysteries. The plaintiffs never resorted to the grievance procedure even for the limited purpose of making sure that their tort right not to be placed under surveillance was not intended to be extinguished by the collective bargaining agreement. Nor do they argue that the company should have invoked the grievance procedure instead of their having to do so because it was the company that thought the procedure would establish its right to conduct the surveillance of which the plaintiffs complain. They have staked their all on persuading us that the surveillance was not even arguably either permitted or forbidden by the collective bar-

gaining agreement, and so was completely outside the scope of section 301. Our previous decision held, however, that it was arguably within the scope of the agreement, so that this suit is a section 301 suit, requiring the plaintiffs to show, what they have never so much as attempted to show, that the union violated its duty of fair representation, thus entitling them to seek a judicial remedy. That holding became the law of the case, binding us should the case return to us a second time, as it has done.

■ But a curious wrinkle that first emerged after our previous decision prevents us from ending this opinion with that observation. It turns out that although the previous opinion refers to the eight plaintiffs as employees, implicitly employees of the company that conducted the surveillance (defendant Amoco), one of them, Tracy Jones, was actually an employee of another company who was working at Amoco's facility at the time of the surveillance. This had been stated in the complaint but nothing was made of it when the case was first before this court— it was the plaintiffs' own counsel who described his clients as eight employees, not seven employees and one independent contractor. The company does not contend, however, that the point has been waived or that the law of the case doctrine, which is not so rigid as to prevent the correction of patent errors, *Messinger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912) (Holmes, J.); *Champaign–Urbana News Agency, Inc. v. J.L. Cummins News Co.*, 632 F.2d 680, 683 (7th Cir.1980); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478 at pp. 789–90 (1981), forbids us to consider it. In keeping with a policy of brevity illustrated by his unexplained remand, the district judge in granting summary judgment because of the plaintiffs' failure to file a timely grievance said nothing about Jones's not being an employee and hence not having any right to invoke the grievance procedure of the collective bargaining agreement. The judge's silence is surprising because the plaintiffs' counsel had argued the point and the company had conceded it, urging summary judgment on the unrelated ground that Jones had

failed to establish that she had ever in fact come under surveillance.

■ Since Jones was not an employee of the company and hence was not a party to the collective bargaining agreement, as all members of the bargaining unit are, *NLRB v. Allis–Chalmers Mfg. Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 2006–07, 18 L.Ed.2d 1123 (1967), her suit for infringement of her right of privacy could not possibly be construed as a suit "really" arising under section 301. Of course the company is entitled to defend the dismissal on a different ground from that of the district judge, provided it was not waived, and it was not. But before we consider that ground we must, although neither side has questioned jurisdiction and the district judge did not allude to the matter, satisfy ourselves that the district court had jurisdiction over Jones's suit. The parties to her suit are not of diverse citizenship, and her suit presents no federal question. It is thus within federal jurisdiction if at all only by virtue of the concept of "pendent party" jurisdiction, which several years ago the Supreme Court squashed in an opinion thought to endanger the entire concept of pendent jurisdiction. *Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989). Congress responded by enacting a statute (expressly applicable to all cases commenced after its effective date, December 1, 1990, and hence to this case) that codifies pendent jurisdiction under the name "supplemental jurisdiction," expressly including pendent party jurisdiction. 28 U.S.C. § 1367(a). Although the scope of the new statute is not clear in all respects, there is no doubt that it covers Jones's suit in light of the very close relation between it and the employees' suit. *Munson v. Milwaukee Board of School Directors*, 969 F.2d 266, 268 and n. 1 (7th Cir.1992). The statute extends the jurisdiction of the federal district court to all claims sufficiently related to the claim on which its original jurisdiction is based to be part of the same case or controversy within the meaning of Article III of the Constitution. If a claim is close enough to the federal (or other) claim that confers federal jurisdiction to be part of the same case, there is no constitutional bar to the assumption of federal jurisdiction over the claim, because Article III confers federal

jurisdiction over cases or controversies rather than over claims; and the new statute goes to the constitutional limit.

Before the statute was enacted, it was the practice for district judges in the exercise of their discretion to relinquish a pendent claim or suit if the main claim was dismissed before trial, as here, but to retain the pendent claim if the claim conferring federal jurisdiction was dismissed after the case had been tried, in order to save the parties the expense of having to try the pendent claim twice. E.g., *Salazar v. City of Chicago,* 940 F.2d 233, 243 (7th Cir.1991); *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449, 458–59 (7th Cir.1982). The new statute surely did not change this practice merely by providing that the district judge "may" relinquish supplemental jurisdiction if the main claim is dismissed, 28 U.S.C. § 1367(c)(3), without expressly qualifying this permission by excluding from its scope cases in which that claim is dismissed after the case had been tried. The legislative history indicates that the new statute is intended to codify rather than to alter the judge-made principles of pendent and pendent party jurisdiction, and this is also the view of the courts and the commentators. *Wentzka v. Gellman,* 991 F.2d 423, 425 n. 1 (7th Cir.1993); Denis F. McLaughlin, "The Federal Supplemental Jurisdiction Statute—A Constitutional and Statutory Analysis," 24 *Ariz. St. L.J.* 849, 975 (1992).

This practice that we believe the new statute carried forward rather than extinguished was not inflexible; there was no rule that if the main claim had not been tried, the pendent claim must be dismissed, and if it had been tried, the pendent claim must be retained, *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988); these were at most presumptions. In particular, if the correct disposition of a pendent claim or action was so clear as a matter of state law that it could be determined without further trial proceedings and without entanglement with any difficult issues of state law, considerations of judicial economy warranted retention and decision rather than relinquishment of the case to the state court. *Disher*

*v. Information Resources, Inc.,* 873 F.2d 136, 140 (7th Cir.1989); *Graf v. Elgin, Joliet & Eastern Ry.,* 790 F.2d 1341, 1347–48 (7th Cir.1986); *United States v. Zima,* 766 F.2d 1153, 1158–59 (7th Cir.1985); *Newport Ltd. v. Sears, Roebuck & Co.,* 941 F.2d 302, 308 (5th Cir.1991). *Wentzka v. Gellman, supra,* 991 F.2d at 425, contains some strong language about how narrow this principle that the pendent claim can be retained if its disposition is straightforward and would not entangle the district judge in difficult issues of state law is. But as it was a case where the state law was unsettled, *id.* at 425–26, it did not really test the outer bounds of the principle.

We can see no reason why it should not be a principle of the new supplemental jurisdiction as well, McLaughlin, *supra,* at 980, bearing in mind the statutory purpose and the legislative history and also the fact that the statute says that the court "may" relinquish its supplemental jurisdiction if various conditions such as the dismissal of all the claims within the court's original jurisdiction are satisfied, not that it must always do so. This case fits the principle so squarely that a remand to enable the district judge to exercise his discretion (for he did not discuss the jurisdictional question) is unnecessary. There are difficult state law issues in the background of Jones's suit, but they need not be decided in order to confirm that her suit has no merit.

A locker room at Amoco's facility (a chemical laboratory) is set aside for its female employees, who use the room to change from their street clothes to their work clothes when they arrive at work and to change back to their street clothes when they leave. The company had received complaints that on the night shift a male supervisor and a female worker were leaving their work stations and going into the locker room together. The company, moved by its potential liability for sexual harassment as well as the fact that other workers were upset and that the two lovebirds were leaving their work stations during work time without authorization and that the male was entering a place off-limits to males, decided to install a television camera at the entrance to the lock-

er room. It turned out to be infeasible to conceal the camera in the ceiling outside the locker room pointing toward the door, so instead the company installed it in the ceiling of the locker room itself, though pointing toward the door rather than toward the interior of the room. The company presented evidence that the camera was turned on only during the night shift, or at least that it was only monitored during that time, and for only four nights. The plaintiffs countered with evidence that the camera ran day and night and for a longer period. The lovebirds were indeed caught on the videotape as they were entering and then leaving the locker room, though the interval during which they were in the room was brief. For unexplained reasons, perhaps not unrelated to the filing of this suit, neither of them was disciplined for their infraction of company rules. The plaintiffs, apart from Jones, are all the female employees of the laboratory at the time of the alleged surveillance.

■ So far as bears on Jones's claim, which is all that survives, the complaint alleges that the company videotaped her in the locker room in a state of undress. Although it is a nice question of tort law whether a well-motivated but unavoidably indiscriminate effort at surveillance is actionable on behalf of a person, not the target of the surveillance, who accidentally wanders onto the scene and is photographed or recorded, we shall assume that it is actionable. We emphasize that this is an assumption rather than a conclusion. Not only has Illinois not yet decided whether to recognize the aspect of the tort right of privacy that consists of freedom from unwarranted intrusion, *Lovgren v. Citizens First National Bank,* 126 Ill.2d 411, 128 Ill.Dec. 542, 544, 534 N.E.2d 987, 989 (1989); see W. Page Keeton *et al., Prosser and Keeton on the Law of Torts* § 117 at pp. 854–56 (5th ed. 1984); *Restatement (Second) of Torts* § 652A(2)(a) (1977), but it can be argued that if the method of surveillance chosen is the least indiscriminate possible for achieving a lawful and important objective, the stranger whose privacy is incidentally and accidentally compromised—he might be an innocent visitor to an apartment under police video surveillance or an innocent party to a wiretapped telephone conversation—should not be heard to complain of the invasion of his privacy; that it is privileged. Few cases bear on the question, see *Birnbaum v. United States,* 588 F.2d 319, 323–26 (2d Cir.1978); *N.O.C., Inc. v. Schaefer,* 197 N.J.Super. 249, 484 A.2d 729, 735 (1984); *Socialist Workers Party v. Attorney General,* 642 F.Supp. 1357, 1420 (S.D.N.Y.1986), and we need not try to resolve it. Even if such a case would be actionable, we do not understand Jones to be denying that the plaintiff, the stranger, must actually have been seen by a live human being (or heard, in the case of wiretapping, but that is not involved here), whether the monitor of the television camera or someone viewing the videotape afterward, *Oliver v. Pacific Northwest Bell Tel. Co.,* 53 Or.App. 604, 632 P.2d 1295 (1981)—or, at the very least, that the plaintiff have been in the place under surveillance so that if the equipment *had* been manned he (or, as here, she) would have been seen or overheard. *Hamberger v. Eastman,* 106 N.H. 107, 206 A.2d 239, 242 (1964); *Harkey v. Abate,* 131 Mich.App. 177, 346 N.W.2d 74, 76 (1983). Otherwise the whole world would have standing to challenge the surveillance of a single telephone booth or toilet stall.

■ *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), established that a party moving for summary judgment can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof. Here the motion challenged Jones (as well as the other plaintiffs, but that is no longer relevant) to produce some evidence that she had been in the locker room during the period (whatever precisely it was) of the surveillance. The plaintiffs' counsel pointed out reasonably enough that all female employees at Amoco's laboratory use the locker room to change their clothes, so anyone working for the company during the period of surveillance would have been in and out of the locker room and would have been caught by the camera, assuming it was on during the day as well as the night shift and was monitored or a tape was made and later watched by someone. Fair enough. But Jones was not an employee of the laboratory. She was

a business invitee. Most business invitees do not change clothes on the premises of the businesses they visit. Some of course do. It depends in part on the nature of their work. All we know on this score about Jones is that she is an electrician. For all we know she came to the laboratory in whatever sort of clothes she works in as an electrician and left in those same clothes without ever going near the locker room. She knows better than we, and could by affidavit or otherwise have submitted evidence that she did in fact use the locker room. Her failure to present any such evidence dooms her case.

It is equally doomed by her failure to present any evidence that the camera was trained on the inside of the locker room rather than, as the company's evidence indicates, just on the door. The plaintiffs' counsel argues that one of his clients may in the midst of undressing have rushed to the door to make sure it was locked and thus have been videotaped in a state of undress. But such fanciful speculations would not defeat a motion for directed verdict and therefore cannot stave off a motion for summary judgment either. Cf. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). If Jones did go to the door in a state of undress, it behooved her to submit an affidavit to that effect. She did not submit such an affidavit—which is not surprising, since so far as appears she never entered the locker room. Nor do we understand her to be claiming that such embarrassment or distress as she may have suffered before she learned that the camera was trained on the door rather than the interior—before in short she knew that it could not have compromised her privacy—could support a tort action for invasion of privacy even if she had frequented the room. *Oliver v. Pacific Northwest Bell Tel. Co., supra*, 632 P.2d at 1299.

The dismissal of the suit is AFFIRMED.