In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1241

JOSEPH HEALY, *et al.*,

*Plaintiffs-Appellants*,

*v.*

METROPOLITAN PIER and EXPOSITION
AUTHORITY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 8892 — **Matthew F. Kennelly**, *Judge.*

ARGUED SEPTEMBER 18, 2015 — DECIDED OCTOBER 23, 2015

Before BAUER, KANNE, and ROVNER, *Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiffs-appellants, Joseph Healy,
Tom O'Driscoll, Alan Porter, James Howland, Karl Diede, Jim
Timothy, and John Ryan (collectively "Plaintiffs"), are electrical
workers. They claim that their respective employers, Freeman
Electrical, Inc. ("Freeman") and Global Experience Specialists,
Inc. ("GES") wrongfully terminated them, in violation of the
relevant collective bargaining agreement (the "CBA") and

applicable federal labor law. Specifically, Plaintiffs claim that collusion between Freeman, GES, and defendant-appellee Metropolitan Pier and Exposition Authority ("MPEA") spurred Plaintiffs' terminations. Plaintiffs also claim that their union, International Brotherhood of Electrical Workers, Local Union No. 134 (the "Union"), failed to adequately represent them in Plaintiffs' CBA-mandated grievance process. Plaintiffs, on behalf of themselves and a putative class of similarly-situated electrical workers, brought a six-count lawsuit against Free-man, GES, MPEA, and the Union (collectively "Defendants"), seeking damages and declaratory judgments.

All Defendants moved to dismiss the counts particular to them. The district court denied the motions to dismiss four of the counts, but dismissed a declaratory judgment motion against MPEA, Freeman, and GES, and the claim of state law tortious interference with contracts against MPEA. In granting MPEA's motion to dismiss the tortious interference claim, the district court held that Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 ("§ 301") preempts Plaintiffs' state law tort claim. Plaintiffs have appealed only the dismissal of the tortious interference claim against MPEA. For the reasons stated below, we affirm the district court's ruling.

## I. BACKGROUND

Plaintiffs allege that defendants illegally circumvented the hiring process detailed in the CBA. At the motion to dismiss stage, we accept the allegations within Plaintiffs' complaint as true and draw all permissible inferences in Plaintiffs' favor. *E.g., Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014).

### A. The CBA Referral Process

The Union has a longstanding CBA with the Electrical Contractors' Association of Chicago. Freeman and GES are members of the Electrical Contractors' Association of Chicago; MPEA is also a party to the CBA. Article IV of the CBA—entitled "Referral Procedure"—describes a regimented process for hiring Union electrical workers. Specifically, Article IV states that the Union "shall be the sole and exclusive source of referral of applicants for employment." To do this, the Union maintains a "pool" of workers from which a given employer will be sent workers for a particular job. Within the overall pool, the Union stratifies workers into four priority groups based on their experience, certifications, and skills. The Union then selects workers within each priority group based on when the workers registered for employment. An employer may only deviate from this "pool hiring" process in two situations: to meet age quotas that the CBA mandates or when the employer "states bona fide requirements for special skills and abilities in his request for applicants." If an employer lays off workers, it must do so in reverse order of that established by the priority group; that is, the employer must terminate workers who are lower on the priority list first.

### B. The McCormick Place Call List

Normally, the Union uses two separate "call lists" for referring workers to potential employers, the "short call" and the "long call." The short call is for jobs demanding less than ten days' labor, while the long call is for jobs requiring at least ten days' labor. However, in referring workers to the McCormick Place convention center, the Union uses a third call

list—the "McCormick Call." All workers sent to McCormick Place begin as short-term workers; that is, for less than ten days' work. MPEA, which operates McCormick Place, may later convert any selected workers from short-term to long-term work. MPEA has not defined the process for converting workers or established standards for how workers qualify for conversion. Instead, Plaintiffs claim that conversion occurs "informally and without transparency."

### C. The 2010 Amendment to the Metropolitan Pier and Exposition Authority Act

In 2009, McCormick Place began losing conventions and exhibitions to competitor convention centers. To help McCormick Place remain competitive, the Illinois legislature amended the Metropolitan Pier and Exposition Authority Act in 2010 (the "Amendment"). Central to the legislative action was the finding that, among other costs, the "mark-up" on union labor work had "substantially increased exhibitor and show organizer costs," and had made McCormick Place a less attractive venue than other convention centers. 70 ILCS 201/5.4(a)(13). To address this problem, the Amendment forbade MPEA from serving "as the exclusive provider of electrical services," and demanded that MPEA "make every effort to substantially reduce exhibitor's costs." 70 ILCS 210/5.4(f). The Amendment allowed MPEA two choices: to retain an outside electrical contractor or offer its own electrical services at cost.

In 2011, to comport with the Amendment's demands, MPEA contracted with Freeman and GES to provide electrical services at McCormick Place. Freeman and GES then hired

workers for McCormick Place electrical work from the Union's McCormick Call list, pursuant to the CBA. Plaintiffs were among those workers hired.

### D. The Side Agreements and Termination of Plaintiffs

On June 29, 2011, the Union entered into "Interpretive Side Letter" agreements with Freeman and GES. These agreements—made without Plaintiffs' knowledge—allowed Freeman and GES to hire electrical workers outside of the established CBA referral process. To continue working at McCormick Place, Freeman and GES had to hire electrical labor provided by MPEA itself, instead of from the established McCormick Call list. After making the "Interpretive Side Letter" agreements with the Union, Freeman and GES entered into agreements with MPEA called the "McCormick Place Utility Services Agreements" ("MPUSAs") on June 30, 2011. These MPUSAs established their own referral process, separate from the referral process detailed in the CBA.

On August 15, 2011, Freeman and GES terminated Plaintiffs and all other Union employees. Since that time, Freeman and GES have used only in-house McCormick Place electricians that MPEA provides for electrical work at the site. Plaintiffs claim that their termination and Freeman's and GES' respective use of in-house electricians contravenes both the CBA hiring process and the demands of the Amendment. Plaintiffs further claim to have "filed numerous grievances" with the Union against their respective employers, but such grievances were "to no avail." Further, after filing their grievances, Plaintiffs received copies of the "Interpretive Side Letter" agreements on October 4, 2011. This was the first time that the Plaintiffs

became aware of the side agreements between the Union, Freeman, and GES.

### E. Procedural History

On November 30, 2011, Plaintiffs filed an internal charge against their local Union officers with the International Brotherhood of Electrical Workers' regional Vice President. Two weeks later, on December 14, 2011, Plaintiffs filed the present lawsuit. The first complaint alleged four counts against the Union, Freeman, and MPEA. Count I, against the Union, alleged breach of duty of fair representation implicit in the Labor-Management Relations Act ("LMRA"), 29 U.S.C. §§ 158(b) and 159(a). Count II, also against the Union, alleged breach of duty of fair representation implicit in § 301. Count III, against Freeman and MPEA, alleged violations of a collective bargaining agreement under § 301. Count IV, against the Union, alleged failure to permit inspection in violation of 29 U.S.C. §§ 414 and 431.

Plaintiffs later amended their complaint, adding GES as a defendant and adding two requests for declaratory judgment. Notably, Plaintiffs also converted their count against MPEA from a § 301 violation of the CBA to a state law tortious interference claim. The amended complaint alleges six causes of actions. Counts I and II, against the Union, still allege breach of duty of fair representation. Count III, against Freeman and GES, alleges violation of a collective bargaining agreement under § 301. Count IV, against MPEA, alleges a state common law claim for intentional interference with contracts. Count V is a request for declaratory judgment: that the district court declare the MPUSAs between MPEA, Freeman, and GES illegal

and unenforceable. Count VI is also a request for declaratory judgment, specifically that the district court declare the "Interpretive Side Letter" agreements between the Union, Freeman, and GES illegal and unenforceable.

All Defendants moved to dismiss the respective counts against them. On April 14, 2015, the district court denied dismissal of Counts I, II, III, and VI. However, the district court dismissed Count V for lack of standing. It also dismissed Count IV, the state law tortious interference claim against MPEA, as preempted by § 301. It noted the long-standing precedent that § 301 preempts any state law claim whose resolution requires interpretation of the relevant collective bargaining agreement. *E.g., Allis-Chambers Corp. v. Lueck*, 471 U.S. 202, 220 (1985); *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 413 (1988). It reasoned that analysis of Plaintiffs' state law tortious interference with contracts claim would require interpretation of the CBA. Accordingly, the district court concluded that § 301 preempts the tortious interference claim. Plaintiffs then appealed only the dismissal of the tortious interference claim against MPEA.

## II. DISCUSSION

MPEA is a political subdivision that is immune from § 301 claims. Here, § 301 preempts the state law tortious interference claim and converts it into a § 301 claim. As a result, MPEA's immunity to § 301 claims extinguishes Plaintiffs' claim against it.

### A.  Standard of Review

The district court did not specify whether its dismissal of Plaintiffs' tortious interference claim was a Federal Rule of Civil Procedure 12(b)(1) dismissal for lack of jurisdiction or a 12(b)(6) dismissal for failure to state a claim. However, we deem a dismissal of preempted state law claims a 12(b)(6) dismissal for failure to state a claim, a dismissal on the merits. *See Turek v. Gen'l Mills, Inc.*, 662 F.3d 423, 425 (7th Cir. 2011) (holding that a court should dismiss claim without any basis in federal law on the merits and that certain preempted claims have no basis in federal law). Thus, the district court's dismissal was a 12(b)(6) dismissal for failure to state a claim. We review such a dismissal *de novo*. *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015).

### B.  MPEA's Immunity From § 301 Claims

Pivotally, the district court noted that because MPEA is a political subdivision, it is immune from federal claims arising under § 301. Section 301(a) grants federal courts jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). That is, the provision grants federal courts jurisdiction over controversies surrounding labor organizations and, by extension, the violation of collective bargaining agreements. *Textile Workers Union of America v. Lincoln Mills of Ala.*, 353 U.S. 448, 450–51 (1957). However, the LMRA definition of "employer" expressly excludes "any State or political subdivision thereof." 29 U.S.C. § 152(2). So, even though a state or political subdivision may sign and be a party to a collective bargaining agreement, it

remains immune from federal lawsuits arising under the collective bargaining agreement and relevant federal law.

Here, MPEA is a political subdivision. 70 ILCS 210/3 ("There is hereby created a *political subdivision*, unit of local government with only those powers authorized by law, body politic and municipal corporation by the name and style of Metropolitan Pier and Exposition Authority in the metropolitan area.") (emphasis added). As a political subdivision, MPEA is not an "employer" under LMRA. 29 U.S.C. § 152(2). Because the MPEA is not an employer, it cannot be sued under § 301. *See* 29 U.S.C. § 185(a).

### C. Section 301 Preemption of State Law Tortious Interference Claim

Section 301 preempts not only claims "founded directly" on the collective bargaining agreement, but also state law claims that indirectly implicate a collective bargaining agreement. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394 (1987). Specifically, § 301 preempts state tort laws that "do not exist independently of private agreements" and that "purport[] to define the meaning of the contract relationship." *Lueck*, 471 U.S. at 213. Thus, § 301 preempts a state law tort claim if resolution of the claim "requires the interpretation of a collective-bargaining agreement." *Lingle*, 486 U.S. at 413. A state law claim "requires the interpretation of a collective bargaining agreement" when *an element* of the claim "requires a court to interpret any term

of a collective-bargaining agreement." *See Lingle*, 486 U.S. at 407.

Under Illinois law,[1] interpretation of the relevant contract is necessary to resolve the tortious interference claim. To state a claim under Illinois law for tortious interference with contracts, a plaintiff must demonstrate:

> (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages.

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 154–55, 545 N.E.2d 672, 676 (1989) (quotations and citations omitted). Thus, to adjudicate a tortious interference

---

[1] The tortious interference claim arises under Illinois law. The district court has 28 U.S.C. § 1367(a) supplemental jurisdiction over the tortious interference claim because the state law claim shares a common nucleus of operative facts with the federal claims. *E.g., Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015). Here, all six counts in the lawsuit are causes of action designed to address the alleged collusion between Defendants, which ultimately led to Plaintiffs' termination. Specifically, Plaintiffs allege that Defendants entered into various side agreements with each other and then terminated Plaintiffs, thereby circumventing the CBA. Because Illinois is the forum state, and because no party has raised a choice of law issue, Illinois law governs. *See McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) (holding when neither party raises a choice of law issue, federal courts hearing state law claims under supplemental jurisdiction "may simply apply the forum state's substantive law").

claim, a court must determine if a breach of the relevant contract has actually occurred. *See Voelker v. Porsche Cars North America, Inc.*, 353 F.3d 516, 527–28 (7th Cir. 2003). Under Illinois law, this determination is one of fact, in which the factfinder must interpret the relevant contract terms and analyze the actions of the party accused of breaching vis-à-vis these contract terms. *See Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 72, 886 N.E.2d 85, 96 (2006). Therefore, to adjudicate a tortious interference claim under Illinois law, a court must interpret the relevant contract. *Lingle*, 486 U.S. at 407.

Specifically, to determine if MPEA tortiously interfered with the CBA, a factfinder would have to determine whether Freeman and GES did in fact breach the terms of the CBA by terminating Plaintiffs. *See HPI Health Care*, 131 Ill. 2d at 154–55, 545 N.E.2d at 676. The district court would have to review the referral process outlined in Article IV of the CBA, and analyze whether Freeman and GES contravened this referral process by signing their respective side agreements with both the Union and MPEA and by then terminating Plaintiffs.

Because Plaintiffs' tortious interference claim requires interpretation of the CBA, § 301 preempts the claim and converts it into a § 301 claim. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 309–14 (2010) (denying employer's tortious interference claim against third-party union); *Kimbro v. Pepsico, Inc.*, 215 F.3d 723, 727 (7th Cir. 2000) (noting that § 301 "is not a tort statute" and holding that determining plaintiff's tortious interference claim would require interpretation of relevant collective bargaining agreement, thus preempting the claim). MPEA's immunity guillotines Plaintiffs' claim against it. *See* 29 U.S.C. §§ 152(2) and 185(a) (excluding

"political subdivision" from the "employer" definition under § 301); 70 ILCS 210/3 (establishing MPEA as a "political subdivision").

## D. Plaintiffs' Arguments

Plaintiffs argue that the preemptive principle undergirding § 301 jurisprudence does not apply in this case. Their argument has three facets. First, they argue that our decisions in *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176 (7th Cir. 1993), and *Kimbro v. Pepsico, Inc.*, 215 F.3d 723 (7th Cir. 2000), carve a jurisdictional pathway around the general preemption of state law claims under § 301. Plaintiffs argue that they have properly followed this path, and that the district court can therefore hear their claim. Second, Plaintiffs argue that the district court, in resolving Plaintiffs' claim against the Union, Freeman, and GES, was already interpreting the CBA, and that this interpretation effectively negates any § 301 preemption. Finally, Plaintiffs argue that preventing them from pursuing the tortious interference claim will leave them without a remedy against a wrongdoing third party, MPEA. However, no exception to the *Lueck-Lingle* bright-line rule, detailed above, applies in this case, and Plaintiffs cannot state a claim against MPEA under state or federal contract or tort law.

### 1. *Brazinski* and *Kimbro* Are Not Applicable

Plaintiffs argue that this case presents an exception to § 301's general preemption of state law claims requiring interpretation of a collective bargaining agreement. Specifically, Plaintiffs cite this court's suggestions around preemption discussed in *Brazinski* and *Kimbro*.

Plaintiffs' reliance on *Brazinski* and *Kimbro* is misplaced. In *Brazinski* and *Kimbro*, this court held that because resolution of the respective tort claims required interpretation of the collective bargaining agreements at issue, § 301 preempted the plaintiffs' respective state law tort claims. *See Brazinski*, 6 F.3d at 1179 (holding that § 301 preempted plaintiffs-employees' invasion of privacy tort claim, because defendant-employers had "a nonfrivolous argument that the surveillance of which the plaintiffs complain is authorized, albeit implicitly, by the management-rights clause of the agreement, so that the plaintiffs' claim that the surveillance invaded their privacy cannot be resolved without an interpretation of the agreement"); *Kimbro*, 215 F.3d at 727 (holding that § 301 preempted plaintiff-employee's tortious interference claim because resolution of claim would require determining whether plaintiff eating food inventory was a proper basis for termination under collective bargaining agreement).

Despite the preemption of the state law tort claims, we held that the plaintiffs in *Brazinski* and *Kimbro* could still have brought a § 301 claim in the district court if they had followed a particular procedure. First, the plaintiff-employee must grieve the dispute using the grievance process outlined in the relevant collective bargaining agreement. *Brazinski*, 6 F.3d at 1179. Second, if the grievance process "does not produce a satisfactory result" for the employee, he can then submit the dispute to arbitration. *Id.* In both proceedings, the union would be the employee's representative. *Id.* Finally, if unsatisfied with the arbitrator's decision, the employee could then bring the claim in federal court. *Id.*; *see also Kimbro*, 215 F.3d at 727 (referencing the *Brazinski* suggestion by noting that this court

"ha[s] suggested that a possible way to preserve [§ 301] causes of action" would be to refer such issues to arbitration).

However, in both *Brazinski* and *Kimbro*, neither plaintiff went through this grievance-arbitration-district court process, and thus waived any such argument. *Brazinski*, 6 F.3d at 1179 (noting that plaintiffs' failure to file grievance by deadline outlined in collective bargaining agreement precluded their claim in federal court); *Kimbro*, 215 F.3d at 727 (holding that "the plaintiff has not picked up on this suggestion in our *Brazinski* decision" by not filing grievance, and thus waived argument). Because the plaintiffs in *Brazinski* and *Kimbro* failed to follow the suggested procedure, the respective district courts properly dismissed their claims. *Brazinski*, 6 F.3d at 1179; *Kimbro*, 215 F.3d at 727.

By contrast, Plaintiffs in this case argue that they have properly followed the *Brazinski-Kimbro* path to the district court. Plaintiffs filed "numerous" grievances, yet the Union never submitted the grievances to arbitration. Under the CBA, Plaintiffs could not pursue arbitration on their own; only the Union could do so on their behalf. But Plaintiffs argue that they overcame the inability to arbitrate by filing a "hybrid" § 301 suit against their respective employers and the Union. *See Vaca v. Sipes*, 386 U.S. 171, 186 (1967) (allowing employee union members to file simultaneous lawsuits against their employer for breach of a collective bargaining agreement and their union for breach of duty of fair representation); *United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 66 (1981) (explicitly referring to this type of suit as a "hybrid" suit). Plaintiffs therefore argue that by filing the grievances and the subsequent hybrid suit, they have comported with the procedural requirements of *Brazinski*

and *Kimbro,* and can sue MPEA for state law tortious interference in federal court.

Plaintiffs misinterpret the implications of *Brazinski* and *Kimbro* and ignore MPEA's immunity from § 301 suits. Plaintiffs misrepresent the claims allowed by *Brazinski* and *Kimbro* as state law tort claims. In those cases, while the plaintiffs originally brought state law tort claims, those claims required interpretation of the relevant collective bargaining agreement. Therefore, the tort claims were preempted and transformed into § 301 contract claims. *Brazinski,* 6 F.3d at 1179; *Kimbro,* 215 F.3d at 727. *See also Lingle,* 486 U.S. at 407; *Lueck,* 471 U.S. at 213; *Caterpillar,* 482 U.S. at 394. Repeatedly and expressly, this court in *Brazinski* and *Kimbro* held that § 301 does not create tort rights. *See Brazinski,* 6 F.3d at 1180 (holding that the interpretive law stemming from § 301 "is a common law of contracts, not a source of independent rights, let alone tort rights"); *Kimbro,* 215 F.3d at 726–27 (disagreeing with federal courts that have held that § 301 creates a tort right and noting that "section 301 creates a right only for breach of a collective bargaining agreement; *it is not a tort statute*") (emphasis added). As a result, the plaintiffs in *Brazinski* and *Kimbro* could not have brought a state law tort claim; they could only have brought a § 301 claim for breach of collective bargaining agreement. However, because they did not follow the grievance-arbitration-district court procedure, the plaintiffs waived their opportunity to bring these claims.

Here, even assuming that Plaintiffs properly followed this *Brazinski-Kimbro* procedure, they would only be able to bring a § 301 claim against the proper parties. But MPEA is not a proper party; it is immune from § 301 claims. Thus, even

though MPEA is a party to the CBA and, even if we assume that Plaintiffs followed appropriate procedural steps to bring their suit against MPEA into district court, § 301 preemption and MPEA's immunity still extinguish the claim.

### 2. Interpreting the CBA Does Not Create Jurisdiction

Plaintiffs also argue that by interpreting the CBA to determine the merits of Plaintiffs' case against Freeman, GES, and the Union, the district court has opened the door to interpreting the CBA to determine the merits of Plaintiffs' case against MPEA. But this argument does not give rise to a cognizable cause of action that a federal district court could resolve. Since § 301 preemption and MPEA's immunity have extinguished Plaintiffs' state law claim, the district court cannot resurrect it.

Federal courts are courts of limited jurisdiction. *E.g., Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 707 F.3d 883, 890 (7th Cir. 2013). We cannot create jurisdiction where we have none. *See Evergreen Square of Cudahy v. Wisc. Hous. and Econ. Dev. Auth.*, 776 F.3d 463, 468 (7th Cir. 2015) (noting that "federal courts possess only that power authorized by Constitution and statute" and that considerations of judicial economy do not alone create jurisdiction) (citations omitted). Regarding immunity specifically, where a state or political subdivision has been granted immunity, "absent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State." *Virginia Off. for Protection and Advocacy v. Stewart*, 563 U.S. 247, 131 S. Ct. 1632, 1637 (2011).

Here, Plaintiffs are private citizens who have brought a claim against an immune political subdivision. MPEA has not

waived its immunity to § 301 suits, nor has any other authority abrogated this immunity. *See Stewart*, 131 S. Ct. at 1638.

Further, the district court's interpretation of the CBA is no abrogation of this immunity, particularly when the precedent on federal court jurisdiction over § 301 suits is patently clear. *See* 29 U.S.C. § 185(a); *Lincoln Mills*, 353 U.S. at 450–51. Federal district courts may interpret labor contracts. *Lueck*, 471 U.S. at 220; *Lingle*, 486 U.S. at 411. Indeed, this is the very mandate of § 301 and its related case law. *Local 175, Teamsters, Chauffeurs, Warehousemen, and Helpers of America v. Lucas Flour*, 369 U.S. 95, 103–04 (1962). But no court or statute has allowed federal courts to hear § 301 suits against immune entities. Accordingly, the district court cannot hear Plaintiffs' claim.

### 3. The "Remedial Gap"

Finally, Plaintiffs argue that § 301's general preemption rules and MPEA's immunity from § 301 claims leave them without a remedy against a third-party like MPEA. We can only acknowledge that this "remedial gap" exists, and hold that we cannot create a remedy where precedent forbids us from doing so. *See Brazinski*, 6 F.3d at 1179–80 (identifying the "remedial gap" that § 301 preemption creates).

Supreme Court precedent and § 301 jurisprudence sever all remedial avenues available to Plaintiffs. First, Plaintiffs cannot pursue a federal § 301 claim against MPEA because MPEA is immune from § 301 suits. Second, Plaintiffs cannot pursue a state law breach of collective bargaining agreement claim against MPEA, because federal law preempts such state law causes of action. *See Lucas Flour*, 369 U.S. at 103–04.

Finally, the Supreme Court's ruling in *Granite Rock* prevents Plaintiffs from pursuing any federal tort claim against MPEA. 561 U.S. at 309–14. Though the facts of *Granite Rock* are not precisely the same as this case, both present the same legal problem: a third-party to a labor dispute insulated from remedy by § 301 preemption. In *Granite Rock*, a concrete and building company employed members of the local chapter of the International Brotherhood of Teamsters ("IBT") union. *Id.* at 292. The employer and the local union began negotiations about a new collective bargaining agreement. *Id.* When negotiations stalled, the employee-union members initiated a strike. *Id.* Because the current collective bargaining agreement had a "no-strike" clause, the employer sued to enjoin the strike. *Id.* at 294. The employer also sued the local chapter of the union under § 301 for breach of the collective bargaining agreement and sued the parent, IBT, for state law tortious interference. *Id.* at 294–95. The district court allowed the § 301 dispute to go to the jury, but granted IBT's motion to dismiss the tortious interference claim as preempted by § 301. *Id.* at 295.

The employer's argument on appeal mirrors Plaintiffs' argument in this case. IBT, like MPEA in this case, was an untouchable third party that the employer argued undermined a labor dispute, yet escaped punishment. The employer specifically claimed that IBT "not only instigated th[e] strike; it supported and directed it." *Id.* at 293. But the employer could do nothing to remedy IBT's alleged actions. *Id.* at 310 (noting the employer's argument that "potential avenues for deterring and redressing [IBT's] conduct are either unavailable or insufficient"). Yet, because the employer could not show that

IBT either signed the relevant collective bargaining agreement or was in a principal-agent relationship with the local chapter which had signed the collective bargaining agreement, IBT was not a signatory to the agreement. *Id.* at 310 (noting that the employer conceded that "international unions structure their relationships with local unions in a way that makes agency or alter ego difficult to establish"). Thus, the employer could not sue IBT under § 301 for breach of the agreement. *Id.* Unable to pursue a § 301 claim, the employer then requested that the Supreme Court provide a remedy by "recogniz[ing] a new federal cause of action under § 301(a)." *Id.* at 292.

The Supreme Court unanimously denied this request and upheld the dismissal of the state law tortious interference claim. *Id.* at 313–14; *see also id.* at 314 (Sotomayor, J., concurring and dissenting) (joining majority's holding to affirm dismissal of the tortious interference claim while dissenting on other grounds). Noting the "host of policy" choices at work in § 301 jurisprudence, the Supreme Court reiterated that § 301 enabled federal courts to create a federal common law of contract interpretation, not of torts. *Id.* at 311 (quoting *Brazinski*, 6 F.3d at 1180 (federal common law created under § 301 is "not a source of independent rights, let alone tort rights")). Thus, to protect the "carefully calibrated" balance struck by § 301 and its related statutes, the Supreme Court refused to create a federal common law tort cause of action under § 301. *Id.* at 311. Accordingly, no such federal tort cause of action is available to Plaintiffs in this case.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the district court.